## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| RATIO CHRISTI AT THE UNIVERSITY OF NEBRASKA-LINCOLN; ZACHARY THOMPSON; HOLLY FISCHER; WILLIAM JOHNSON; and ELENA THOMSON, <br><br> *Plaintiffs,* <br><br> v. <br><br> The Members of the Board of Regents of the University of Nebraska: TIMOTHY CLARE, JACK STARK, JIM PILLEN, ELIZABETH O'CONNOR, ROBERT SCHAFER, CHAIR PAUL KENNEY, VICE CHAIR BOB PHARES, and BARBARA WEITZ, all individually and in their official capacities; <br><br> TED CARTER JR., President of the University of Nebraska, individually and in his official capacity; <br><br> RONNIE GREEN, Chancellor for the University of Nebraska-Lincoln; and LAURIE BELLOWS, Vice Chancellor for Student Affairs, all individually and in their official capacities; <br><br> ASSOCIATION OF STUDENTS OF THE UNIVERSITY OF NEBRASKA AT LINCOLN; and <br><br> THE UNIVERSITY PROGRAM COUNCIL, <br><br> *Defendants.* | Civil Case No. 4:21-cv-3301 <br><br> **VERIFIED COMPLAINT** <br> **Jury Trial Demanded** |

### PLAINTIFFS' VERIFIED COMPLAINT

Plaintiffs, for their Verified Complaint against Defendants, state:

### INTRODUCTION

1.      It is unconstitutional for the government to favor one private speaker over another based on the speaker's motivating ideology, opinion, or perspective. This prohibition against viewpoint discrimination applies to public universities. The United States Supreme Court has thus held that public universities, when using mandatory student activity fees to facilitate student expression, must allocate those fees in a viewpoint-neutral manner.

1

2.     The University of Nebraska-Lincoln's allocation of student fees fails this fundamental, clearly established principle.

3.     Each year, the University collects from its students more than $28 million in student fees. It apportions these fees into two funds: Fund A, which is more than $1 million and funds programs and activities managed by student groups, and Fund B, which is approximately $27 million and funds student unions and centers, among other things.

4.     Student fees from each fund, collectively amounting to hundreds of thousands of dollars of fees each year, are used to support student speech.

5.     Yet contrary to what Supreme Court precedent demands, the student fees used to support student speech are not disbursed under viewpoint-neutral standards.

6.     The University's constitutional problems begin at the top with the Board of Regents and its constitutionally flawed policy that governs the sponsorship of speakers with student fees ("Campus Speakers Policy").

7.     The Campus Speakers Policy is viewpoint discriminatory on its face and also gives University officials unbridled discretion to engage in viewpoint discrimination by failing to set out narrow, objective, and definite standards for the disbursement of student fees for extracurricular speech.

8.     The Campus Speakers Policy requires "student programming organizations"—i.e., those University organizations that bring in speakers for student events or distribute student fees for that purpose—to "provide reasonable political and ideological balance on subjects of politics and government."

9.     In other words, the Policy requires a programming organization and Defendants to discriminate based on the speakers' viewpoints.

10.    The Campus Speakers Policy also directs that if a programming organization "sponsors a speaker that represents one part of a political or

2

ideological spectrum of ideas," the organization must "make reasonable attempts to sponsor a different program within the same academic year which generally represents the opposing part of that spectrum."

11.     That directive requires the programming organization and Defendants to judge a proposed second speaker's viewpoint to determine whether it would sufficiently represent "the opposing part of th[e] spectrum."

12.     There is no clear meaning of, or definition for, the "opposing part of the spectrum."

13.     In short, the Campus Speakers Policy not only fails to set out narrow, objective, and definite standards to protect against viewpoint discrimination, but the Policy also explicitly demands viewpoint discrimination.

14.     Given the Board's lack of viewpoint-neutral standards, it comes as little surprise that Defendants, through the Association of Students—the Student Government—annually allocates student fees for student speech in a viewpoint discriminatory manner.

15.     In fact, each year, hundreds of thousands of dollars of such fees, if not more, are disbursed (or not) based on the viewpoints expressed in student speech, including the viewpoints of private speakers.

16.     Of the more than $1 million of student fees that the Student Government allocates each year, it disburses more than $500,000 to itself. The Student Government divides the remainder among two student newspapers, the University performing arts center and the University Program Council.

17.     The Student Government annually allocates more than $280,000 to the University Program Council.

18.     The Program Council is a recognized student organization that other recognized student organizations must apply to for event funding.

19.     The Program Council is also a "student programming organization" at the University and thus charged by the Board of Regents under the Campus Speakers Policy with "administering the speakers program" at the University.

20.     Of the $280,000 in student fees that the Program Council receives each year, it earmarks about $10,000 ("RSO Event Fund") to fund events held by the hundreds of recognized student organizations on campus.

21.     The Council keeps the remaining $270,000 of its budget ("UPC Event Fund") to fund its own events.

22.     In January 2021, Plaintiff Ratio Christi—Latin for "The Reason of Christ"—applied for up to $1,500 from the RSO Event Fund to help pay for an upcoming lecture by Dr. Robert Audi, a Christian philosopher and University of Notre Dame professor.

23.     Dr. Audi titled his lecture, "Is Belief in God Rational Given the Evils of This World? A Christian Philosopher Responds to the Most Popular Argument Against God."

24.     Defendants, through the Program Council, denied Ratio Christi's request.

25.     The Program Council explained that the RSO Event Fund could not be used to pay for "speakers of a political and ideological nature."

26.     The Council also said the RSO Event Fund could be used to pay for Dr. Audi's appearance, but only if "another spokesperson with a different ideological perspective" spoke at the same event.

27.     In a later email to Ratio Christi, the Program Council explained that it wouldn't fund Dr. Audi's event because of "its *Christian* ideological nature" and "*Christian* perspective" and because it was the Council's "job to make sure all . . . ideological perspectives and beliefs are being considered, not just *Christianity*."

4

28.     Either version of the Program Council's policy concerning distribution of monies from the RSO Event Fund ("RSO Event Fund Policy")—the "no ideology allowed" version or the "counterviewpoint required" version—necessarily required Defendants to make a funding decision based on Ratio Christi's and Dr. Audi's Christian viewpoint.

29.     But Defendants do not impose on the Program Council or other organizations that engage in student speech the same "no ideology allowed" or "counterviewpoint required" condition when sponsoring events with student fees.

30.     Instead, Defendants spend hundreds of thousands of dollars in student fees each year to pay for speakers and other events promoting political and ideological viewpoints on topics like sexual orientation, "gender identity," "reproductive justice," social justice, police reform, and political activism.

31.     And Defendants do not present opposing viewpoints.

32.     Commonly, the student speech that Defendants fund on those and other topics conflict with the viewpoints held by Ratio Christi, the Student Plaintiffs, and other University Students.

33.     Defendants' viewpoint discrimination has violated Plaintiffs' clearly established rights under the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus entitled to their requested declaratory, injunctive, and monetary relief.

## JURISDICTION & VENUE

34.     Plaintiffs sue under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments to the United States Constitution.

35.     Plaintiffs seek declaratory relief under 28 U.S.C. §§ 2201–2202 and Federal Rule of Civil Procedure 57, injunctive relief under 42 U.S.C. § 1983 and Federal Rule of Civil Procedure 65, damages under 42 U.S.C. § 1983, and reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

36.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the United States Constitution and federal law.

37.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1343 because Plaintiffs seek to recover damages and equitable relief under 42 U.S.C. § 1983.

38.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district and because Defendants reside in this district.

## PLAINTIFFS

39.     Plaintiff Ratio Christi at the University of Nebraska-Lincoln is an unincorporated expressive and religious association made up of University of Nebraska-Lincoln students.

40.     Ratio Christi at the University of Nebraska-Lincoln is affiliated with the global organization Ratio Christi, an apologetics ministry with more than 100 student-led chapters at universities in the United States and internationally.

41.     As a Christian apologetics organization, Ratio Christi at the University of Nebraska-Lincoln ("Ratio Christi") seeks to advance a biblical worldview and explain how the Bible informs various moral, cultural, and political issues.

42.     Ratio Christi's mission is best summarized by the biblical passage found at 1 Peter 3:15–16 and prominently quoted on their website: "Sanctify Christ as Lord in your hearts, always be ready to make a defense to everyone who asks you to give an account for the hope that is in you, yet with gentleness and respect."

43.     Toward those aims, Ratio Christi holds weekly Bible studies and speaks at churches, camps, and various events. And during the school year, Ratio Christi holds large events open to all students, which feature renowned theologians or members of the academy who give lectures in defense of the Christian faith or debate another academic who believes Christianity is false.

6

44.     Ratio Christi has maintained its status as a recognized student organization at the University of Nebraska-Lincoln since 2019.

45.     The individually named Student Plaintiffs—Zachary Thompson, Holly Fischer, William Johnson, and Elena Thomson—are students at the University of Nebraska-Lincoln, payors of mandatory student activity fees, and Ratio Christi officers and members.

46.     Plaintiff Thompson is the President of Ratio Christi.

47.     Plaintiff Fischer is the Vice President of Ratio Christi.

48.     Plaintiff Johnson is the Treasurer of Ratio Christi.

49.     Plaintiff Thomson is the Secretary of Ratio Christi.

50.     Student Plaintiffs sue as officers of Ratio Christi and in their individual capacities.

**DEFENDANTS**

**A. System Defendants**

51.     Defendants Timothy Clare, Jack Stark, Jim Pillen, Elizabeth O'Connor, Robert Schafer, Chair Paul Kenney, Vice Chair Bob Phares, and Barbara Weitz are members of the Board of Regents for the University of Nebraska ("Regent Defendants"), a public university system under the laws of Nebraska comprising four university campuses, including the University of Nebraska-Lincoln.

52.     State law empowers Regent Defendants to exercise "general government," Neb. Const. Art. VII, § 10, and "[t]o enact laws for the government of the university," Neb. Rev. Stat. § 85-106(1).

53.     Regent Defendants have the power to elect, set job duties for, and remove all University employees, including the President, Chancellor, and Vice Chancellors. Neb. Rev. Stat. § 85-106(2), (3), (8).

54.     Regent Defendants have "constitutional and statutory power for general supervision over all elements of the University, control and direction of all

expenditures, and for general operating policies of the University." Ex. 1, Excerpts of Bylaws of the Board of Regents of the University of Nebraska ("Board Bylaws"), § 1.2.

55.     Regent Defendants are responsible for enacting, amending, or repealing University policies and practices and ensuring such policies and practices comply with the law, including the system of allocating mandatory student activity fees to support student speech challenged here.

56.     Regent Defendants annually allocate the nearly $27 million dollars in Fund B fees.

57.     Regent Defendants know or should know that student fees are used to support student speech.

58.     Regent Defendants know or should know that student fees used to support student speech are not allocated in a viewpoint-neutral manner. Although Defendants know this, they have failed to enact viewpoint-neutral standards.

59.     Regent Defendants know or should know that the Campus Speakers Policy and RSO Event Fund Policy are viewpoint-discriminatory on their face and were enforced against Plaintiffs. Although Defendants know this, they have failed to amend or repeal these Policies or take other corrective action.

60.     Regent Defendants are sued in their official and individual capacities.

61.     Defendant Ted Carter Jr. is the President of the University of Nebraska.

62.     As President, Defendant Carter is "the chief executive officer" of the University of Nebraska and is responsible for "enforc[ing] the regulations and orders" of the Board of Regents. Ex. 1, Board Bylaws § 2.2.

63.     Defendant Carter is responsible for "the planning, development, and appraisal of all activities" of the University of Nebraska and is responsible for "coordination and implementation" of those activities. *Id.*

8

64.     Defendant Carter may delegate his authority in those areas to inferior officers, as approved by the Board of Regents. *Id.*

65.     Defendant Carter is empowered to "issue directives and executive orders" consistent with the Board of Regents' policies. *Id.*

66.     Regent Defendants annually allocate Fund B fees upon Defendant Carter's recommendation.

67.     Defendant Carter knows or should know that student fees are used to support student speech.

68.     Defendant Carter knows or should know that student fees used to support student speech are not allocated in a viewpoint-neutral manner. Although Defendant Carter knows this, he has failed to enact, or cause the enactment of, viewpoint-neutral standards.

69.     Defendant Carter knows or should know that the Campus Speakers Policy is viewpoint-discriminatory on its face and was enforced against Plaintiffs. Although Defendant Carter knows this, he has failed to issue directives or orders that interpret the Policy in a constitutional manner or take any other corrective action.

70.     Defendant Carter knows or should know that the RSO Event Fund Policy is viewpoint-discriminatory on its face and was enforced against Plaintiffs. Although Defendant Carter knows this, he has failed to amend or repeal the Policy or take any other corrective action.

71.     Defendant Carter is sued in his official and individual capacities.

**B. Campus Defendants**

72.    Defendant Chancellor Ronnie Green is the Chancellor of the University of Nebraska-Lincoln ("University").

73.    As Chancellor, Defendant Green is the University of Nebraska-Lincoln's "chief executive officer" and directly reports to Defendant Carter. Ex. 1, Board Bylaws § 2.8.

74.    Defendant Green enforces the regulations and orders of Regent Defendants and Defendant Carter. Ex. 2, University of Nebraska-Lincoln Bylaws § 1.2.1.

75.    Defendant Green has the authority to issue policy memoranda that are effective throughout the University. *Id.*

76.    Defendant Green's responsibilities include general supervision of all relationships between students and the University of Nebraska-Lincoln's major administrative units, including "student activities and services." Ex. 1, Board Bylaws § 2.8.2(b).

77.    Regent Defendants annually allocate Fund B fees upon Defendant Green's recommendation.

78.    Defendant Laurie Bellows is the Vice Chancellor for Student Affairs at the University of Nebraska-Lincoln.

79.    As the Vice Chancellor for Student Affairs, Defendant Bellows is the University's "executive officer in non-academic matters relating to student life." Ex. 2, University of Nebraska-Lincoln Bylaws § 1.2.2.4.

80.    Within that context, she "has a major responsibility for offering to the students educational, intellectual, residential, recreational, and cultural programs and for developing a climate of community on the campus." *Id.*

81.     As the Vice Chancellor for Student Affairs, Defendant Bellows supervises and directs the Office of Student Affairs, which oversees Defendant Association of Students.

82.     On information and belief, as the executive officer in non-academic affairs relating to student life, Defendant Bellows also oversees Defendant University Program Council.

83.     Defendants Green and Bellows know or should know that student fees are used to support student speech.

84.     Defendants Green and Bellows know or should know that student fees used to support student speech are not allocated in a viewpoint-neutral manner. Although Defendants Green and Bellows know this, they have failed to enact viewpoint-neutral standards.

85.     Defendant Bellows—whose office oversees the Association of Students and the University Program Council—has also failed to ensure those student governmental organizations disburse student fees for student speech in a viewpoint-neutral manner.

86.     Defendants Green and Bellows know or should know that the Campus Speakers Policy is viewpoint-discriminatory on its face and was enforced against Plaintiffs. Although Defendants know this, they have failed to interpret the Policy in a constitutional manner or take any other corrective action.

87.     Defendants Green and Bellows know or should know that the RSO Event Fund Policy is viewpoint-discriminatory on its face and was enforced against Plaintiffs. Although Defendants know this, they have failed to amend or repeal the Policy or take any other corrective action.

88.     Defendants Green and Bellows are sued in their official and individual capacities.

11

89.     Regent Defendants have delegated to Defendant Association of Students—the Student Government—the authority to annually allocate Fund A fees. Ex. 6, Excerpts of University of Nebraska Board of Regents Policies ("Board Policies"), RP 5.9.1, ¶ 3(a).

90.     That authority is subject only to Vice Chancellor Bellows' approval. *Id.*

91.     The Student Government comprises the Student Senate and the Senate Committee for Fund Allocations ("Senate CFA"). Ex. 7, Association of Students of the University of Nebraska Bylaws and Special Rules ("ASUN Bylaws"), Art I, § 1 & Art. IV, § 1.H.

92.     Defendant Bellows, or her designee, advises the Senate CFA.

93.     The Student Government is the "supreme student governing body" at the University. Ex. 3, Excerpts of Association of Students of the University of Nebraska at Lincoln Constitution ("ASUN Constitution"), Art. II.

94.     Regent Defendants have delegated to the Student Government "the authority to develop reasonable rules and regulations for . . . student self-government," with the condition that "the Board [of Regents] reserves to itself all powers and responsibilities to take any action required in the exercise of its constitutional and statutory responsibilities." Ex. 1, Board Bylaws § 1.2.

95.     The Student Government's authority includes "review[ing] for approval actions taken by student groups," including Defendant University Program Council, "when such actions are of concern to the student body." Ex. 3, ASUN Const. Art. IV, § 1.

96.     Subject to Defendant Bellows' and Regent Defendants' approval, the Student Government allocates the mandatory student fees used to fund programs and activities managed by student groups. Ex. 1, Board Bylaws § 2.13(b).

97.     Defendant University Program Council is a student programming organization.

12

98.     The Program Council's mission, per its constitution, is to "provide[ ] diverse, educational, and entertaining programs to enhance the Nebraska Community." Ex. 9, University Program Council Constitution ("UPC Constitution"), Art. II.

99.     Because the Program Council is a student programming organization, Regent Defendants have authorized the Council to receive student fees through the Student Government. Ex. 6, Excerpts of University of Nebraska Board of Regents Policies ("Board Policies"), RP-5.9.1, ¶ 2(a).

100.     Regent Defendants have also authorized the Program Council to allocate student fees to student groups and organizations, including recognized student organizations, to support the programming needs of those groups and organizations. *Id.* ¶ 2(c).

101.     The Program Council, including its internal committee—the Fund Allocation Committee—applies and interprets the RSO Event Fund Policy challenged here.

102.     The Student Government and University Program Council know that student fees used to support student speech are not allocated in a viewpoint-neutral manner. Although Defendants know this, they have failed to enact viewpoint-neutral standards or disburse those fees in a viewpoint-neutral manner.

103.     The Student Government and University Program Council know that the Campus Speakers Policy is viewpoint-discriminatory on its face and was enforced against Plaintiffs. Although Defendants know this, they have failed to interpret the Policy in a constitutional manner or to take any other corrective action.

104.     The Student Government and University Program Council know that the RSO Event Fund Policy is viewpoint-discriminatory on its face and enforced this Policy against Plaintiffs. Although Defendants know this, they have failed to amend or repeal the Policy and take any other corrective action.

105.    Each of the acts and policies alleged in this Complaint are and were attributed to Defendants who have acted and continue to act under color of a statute, regulation, or custom of the State of Nebraska.

FACTUAL ALLEGATIONS

I.    **Defendants' mandatory student activity fee system**

106.    Every semester, the University of Nebraska-Lincoln ("University") collects from each student more than $600 in mandatory student activity fees, or what the University calls "University Program and Facilities Fees."

107.    For students who took at least seven credit hours during the 2019–2020 and 2020–2021 school years, the student fees were $624 and $617 per semester. Those same students are paying $631 per semester for the 2021–2022 school year.

108.    Plaintiffs Zachary Thompson and William Johnson have each paid more than $3,000 in student fees since they first enrolled in 2019.

109.    Plaintiffs Holly Fisher and Elena Thomson have each paid more than $1,800 in student fees since they first enrolled in 2020.

110.    The University has collected approximately $28 million in student fees each year since at least 2019.

111.    The University estimates that it will collect approximately $28.3 million in student fees during the 2021–2022 school year. Ex. 4, Student Affairs, Student Fee Allocations website printout, available at https://bit.ly/3nVqqFB (last visited Oct. 25, 2021).

112.    The University divides the student fees into two funds: just over $1 million goes into "Fund A" to pay for programs and activities managed by student groups and more than $27 million goes into "Fund B" to service debt on facilities and fund staff salaries and operating costs for various student services. *Id.*

14

113.    The portion of student fees that go into Fund B, or approximately $600 per student, per semester, are not refundable.

114.    The University permits students to request a refund of that portion of their student fees that go into Fund A, or up to around $26 per student per semester.

115.    But tuition invoices do not tell students about the right to a refund of the student fees that go into Fund A.

116.    If a student were to go the Student Accounts page—the seemingly natural place for a student to search for answers to questions about student fees— the student would read that activity fees are among the eleven "mandatory fees" extracted by the University each semester. Ex. 5, Student Accounts, Undergraduate Tuition website printout, available at https://bit.ly/3nUGt6Q (last visited Oct. 25, 2021).

117.    The Student Accounts page says nothing about a student's right to a refund of the student fees allocated to Fund A. *Id.*

118.    What's more, students have only four weeks from the start of the semester to request a refund.

119.    On information and belief, very few of the approximately 26,000 students who attend the University each year are aware of the right to request a refund of the portion of their student fee payment that finances Fund A.

120.    On information and belief, very few of the approximately 26,000 students who attend the University each year request or obtain a refund of that portion of their student fees that finance Fund A.

15

A. **The annual allocations of Fund A and Fund B fees**

   (1) **Fund A**

121.   Regent Defendants permit allocation of Fund A fees to three kinds of student organizations: student government, student programming, and student newspapers. Ex. 6, Excerpts of University of Nebraska Board of Regents Policies ("Board Policies"), RP-5.9.1, ¶ 2(a).

122.   The Student Government, through the Student Senate and Senate CFA, annually allocates the Fund A fees.

123.   Each year, the Student Government, the University performing arts center, two student newspapers, and Defendant University Program Council present their next year's funding needs to the Senate CFA.

124.   Each year, upon the Senate CFA's recommendation, the Student Senate passes an appropriations bill to fund each of these organizations from the more than $1 million in Fund A fees.

125.   Each year since 2019, the Student Government has received more than $500,000 in Fund A fees; the student newspapers have collectively received around $165,000 in Fund A fees; the performing arts center has received about $210,000 in Fund A fees; and the University Program Council has received around $280,000 in Fund A fees.

126.   The Fund A allocations for the 2021–2022 school year are $535,929 for the Student Government, $166,002 for the student newspapers, $210,000 for the performing arts center, and $281,657 for the University Program Council. Ex. 8, ASUN Appropriations Bills for 2021–2022 Academic Year, at 1–5.

127.   Of the approximately $280,000 in Fund A fees that the Student Government distributes to the Program Council each year, the Council allocates around $10,000 to the RSO Event Fund to finance events held by recognized student organizations.

128.    The Council allocated $10,000 to the RSO Event Fund for the 2020–2021 school year and 2021–2022 school year.

129.    The Council cannot disburse RSO Event Fund monies to a single recognized student organization more than once in a two-year period. Ex. 6, Board Policies, RP-5.9.1, ¶ 2(c); Ex. 10, University Program Council, Fund Allocation Committee website printout, found at https://bit.ly/3DeMJeV (last viewed Oct. 25, 2021).

130.    The Council uses the remaining $270,000 of Fund A fees—i.e., the UPC Event Fund—to host its own programs and events for students.

131.    Fund A fees are used to support student speech.

**(2) Fund B**

132.    Regent Defendants, upon the recommendation of President Carter and Chancellor Green, annually allocate the nearly $27 million Fund B fees to the University's bond debt, student unions, student centers, student health services, student recreational programs and facilities, and transit services.

133.    The Student Government also recommends to Regent Defendants how they should allocate the Fund B fees not dedicated to bond debt.

134.    Like Fund A recipients, Fund B recipients appear before the Senate CFA each spring and request money for the next school year.

135.    As it does for the allocation of Fund A fees, the Student Senate passes an appropriations bill for each allocation of Fund B fees.

136.    Thus, for instance, each year since at least 2019, the Student Government has passed an appropriations bill of approximately $5 million to fund the operations of the Nebraska Unions, or what are the three student unions on campus: the Nebraska Union, Nebraska East Union, and the Jackie Gaughan Multicultural Center.

137.     Various student centers have designated space in the Nebraska Unions, including the Women's Center and the LGBTQA+ Center.

138.     University students are employed by and do volunteer work for the Women's Center and LGBTQA+ Center.

139.     According to the LGBTQA+ Center's website, "The LGBTQA+ Center, along with the Women's Center, at the University of Nebraska-Lincoln serves students and the campus community through a focus on Gender, Sexuality and Social Justice. We are dedicated to transforming campus climate at the university for students, staff, faculty, alumni and community members by developing and supporting a more inclusive understanding of gender and sexuality through education, advocacy, outreach and development opportunities."

140.     In March 2021, the Student Government passed an appropriations Bill in the amount of $5,043,508 from Fund B fees to finance the Nebraska Unions during the 2021–2022 school year. Ex. 8, ASUN Appropriations Bills for 2021–2022 Academic Year, at 6.

141.     On information and belief, the Women's Center and LGBTQA+ Center receive Fund B fees.

142.     The Women's Center and LGBTQA+ Center fund extracurricular speaking events.

143.     On information and belief, the Women's Center and LGBTQA+ Center use Fund B fees to fund those events.

**B. The viewpoint-discriminatory Campus Speakers Policy and RSO Event Fund Policy**

144.     Regent Defendants' Campus Speakers Policy applies to "student programming organizations administering the speakers programs on each campus." Ex. 6, Board Policies, RP 5.6.1.

145.    The University Program Council is a student programming organization that administers the speakers program on the University of Nebraska-Lincoln campus.

146.    Under the Campus Speakers Policy, the University Program Council, and any other student programming organization that administers a speakers program, must:

a.  "provide reasonable political and ideological balance on subjects of politics and government," *id.* ¶ 2;

b.  "make reasonable attempts to sponsor a different program within the same academic year which generally represents the opposing part of [the] spectrum of political or ideological ideas" if earlier in the school year "the organization sponsor[ed] a speaker that represents one part of a political or ideological spectrum of ideas," *id.*;

c.  "make every attempt to remain neutral and fair in the selection of speakers on subjects of politics, government, and ideologies," *id.* ¶ 3; and

d.  "organize internal committees that will have an ongoing responsibility to ensure that a balanced program is presented," *id.* ¶ 4.

Ex. 6, Board Policies, RP-5.6.1.

147.    Each of these provisions requires the University Program Council to consider a proposed speaker's viewpoints when making the decision whether to use student funds to pay for the speaker's appearance.

148.    The Campus Speakers Policy also fails to set out narrow, objective, and definite standards to govern that funding decision.

149.    Instead, the Policy sets out non-exhaustive guidelines using undefined terms or phrases subject to a range of interpretations.

19

150.    The terms and phrases subject to a range of interpretations include "reasonable political and ideological balance," "spectrum of ideas," "reasonable attempts," "generally represents," "opposing part of [the] spectrum," "make every attempt," "neutral and fair," and "balanced program."

151.    The RSO Event Fund Policy reads: "Any funds granted to an RSO by [the University Program Council Fund Allocation Committee] shall not be used to finance . . . speakers of a political and ideological nature." Ex. 10, UPC Fund Allocation Committee website.

152.    The RSO Event Fund Policy does not define "political," "ideological," or "political and ideological nature."

153.    Despite the RSO Event Fund Policy's explicit proscription against using RSO Event Fund monies to pay for "speakers of a political and ideological nature," the University Program Council interprets the Policy to permit funding of such speakers so long as "another spokesperson with a different ideological perspective" speaks at the same event. Ex. 11, Email String between UPC Fund Allocation Committee and Ratio Christi, at 4.

154.    The University Program Council has provided no guidance on what degree of difference is needed to meet the "different ideological perspective" standard.

155.    The RSO Event Fund Policy, including the Program Council's interpretation of that Policy, stems from the Regent Defendants' Campus Speakers Policy.

156.    The RSO Event Fund Policy either bars the funding of speakers who express a political or ideological viewpoint or requires a recognized student organization that uses the RSO Fund to pay for such a speaker to arrange for another speaker with a counterviewpoint to speak at the same event.

20

157.   Either way, the RSO Event Fund Policy, like the Campus Speakers Policy, fails the viewpoint-neutrality requirement because it requires Defendants to make student speech funding decisions based on a speaker's viewpoint.

158.   The RSO Event Fund Policy, including the Program Council's interpretation of the Policy, also fails to set out narrow, objective, and definite standards to govern University officials' funding decisions.

159.   Plaintiffs have reviewed materials published by the University of Nebraska, the University of Nebraska-Lincoln, and University student groups for other standards that might govern Defendants' allocation of student fees used to support student speech.

160.   The materials Plaintiffs have reviewed include: the Board Bylaws; Board Policies; Bylaws of the University of Nebraska-Lincoln, https://bit.ly/3yfGC6d (last viewed Oct. 25, 2021); Chancellor's Policy Memoranda, https://bit.ly/3sPdAt9 (last viewed Oct. 25, 2021); ASUN Constitution; ASUN Bylaws; Senate CFA website, https://bit.ly/38jd0du (last viewed Oct. 25, 2021); Constitution of the University Program Council of the University of Nebraska; and the website for the University Program Council's Fund Allocation Committee, https://bit.ly/3DeMJeV (last viewed Oct. 25, 2021).

161.   On information and belief, the Campus Speakers Policy and RSO Event Fund Policy are the only University policies that govern the allocation of mandatory student fees for the support of student speech.

162.   Under the Campus Speakers Policy and RSO Event Fund Policy, mandatory student fees have been and will be allocated to fund extracurricular speech that expresses viewpoints that conflict with those held by Student Plaintiffs, other student members of Ratio Christi, and, on information and belief, thousands of other University students.

21

## II.   Defendants' viewpoint discrimination against Ratio Christi

163.   The University Program Council, through its Fund Allocation Committee, disburses RSO Event Fund monies to recognized student organizations "on a first come first serve basis." Ex. 10, UPC Fund Allocation Committee website.

164.   Once every two years, a recognized student organization can obtain up to $1,500 from the RSO Event Fund.

165.   To apply for funds, a recognized student organization must fill out an application that requires it to disclose "the purpose of your organization," the "Description & Purpose of the Event," how the event will "serve your organization and further its purpose," and the time, place, and estimated total expenses for the event.

### A. Defendants refuse to fund a Ratio Christi event because of its Christian viewpoint.

166.   In January 2021, Plaintiffs applied for up to $1,500 from the RSO Event Fund to fund a lecture by Dr. Robert Audi in March or April 2021.

167.   Dr. Audi is a Christian philosopher and University of Notre Dame professor who, before his Notre Dame professorship, taught for nearly 30 years at the University of Nebraska-Lincoln. He has authored several books and published more than a hundred academic writings.

168.   Ratio Christi asked Dr. Audi to speak on a philosophy topic of his choice from a Christian perspective. Dr. Audi titled his planned lecture, "Is Belief in God Rational Given the Evils of This World? A Christian Philosopher Responds to the Most Popular Argument Against God."

169.   On February 8, 2021, the University Program Council emailed Ratio Christi expressing "concern[ ] about the nature of this event." Ex. 11 at 4.

170.   The Program Council explained, "According to our [Fund Allocation Committee] Bylaws," the RSO Event Fund "shall not be used to finance political campaigns, or speakers of a political and ideological nature." *Id.*

171.   The Program Council added, "In order to comply with this bylaw your event would need to provide another spokesperson with a different ideological perspective . . . ." *Id.*

172.   In a reply email, Ratio Christi said that it "[did] not wish to add another speaker to this event." *Id.* at 5. Ratio Christi explained, "Our goal as a Christian organization is to offer a Christian academic perspective to students who may not have encountered it before. We didn't intend for this event to be a debate, but more of an introductory explanation of a particular philosophical position." *Id.* at 5.

173.   In that same email, Ratio Christi informed the Program Council of the title of Dr. Audi's planned lecture and said he would hold a question-and-answer session after the lecture. *Id.*

174.   Ratio Christi added: "Since the topic is philosophical and will be presented by an academically respected professional philosopher, [Dr. Audi] will make a philosophical case for a certain position, as all philosophers do." *Id.*

175.   Ratio Christi asked the University Program Council to identify "the guidelines or policies that clarify what is and is not ideological[.]" *Id.*

176.   The University Program Council responded on March 11, 2021, stating that its "Fund Allocation Committee cannot fund this event due to its Christian ideological nature." *Id.*

177.   "The definition of ideology," the Program Council explained, "is based on a group of ideals and beliefs and in this case that would be the Christian perspective." *Id.*

178.   The Program Council added: "The funds we allocate to RSO's come[ ] directly from student fees. With that in mind, it is our job to make sure all the ideological perspectives and beliefs are being considered, not just Christianity." *Id.*

23

179.   The University Program Council thus denied Ratio Christi's request to fund Dr. Audi's lecture from the RSO Event Fund.

180.   Ratio Christi still held the event on April 27, 2021.

181.   Ratio Christi and its members funded the event.

182.   Dr. Audi reduced his requested honorarium from $1,500 to $750 upon learning the University denied funding for the event. Ex. 12, Audi Event Expenses.

183.   Ratio Christi and its members incurred other expenses, too, including expenses to market the event. *Id.*

184.   The total expenses were just over $900.

185.   On information and belief, Defendants have allocated RSO Event Fund monies to recognized student organizations—including secular student organizations—to pay for "speakers of a political and ideological nature," and have done so without requiring those organizations to include "another spokesperson with a different ideological perspective" at the same event.

186.    On information and belief, Defendants have allocated RSO Event Fund monies to recognized student organizations—including secular student organizations—to pay for "speakers of a political and ideological nature" without "mak[ing] sure all . . . ideological perspectives and beliefs are being considered."

**B. Defendants fail to follow their own alleged standards.**

187.   The University repeatedly uses mandatory student fees to support student speech that expresses a political or ideological viewpoint.

188.   The University Program Council—the same body that claims that its "job [is] to make sure all . . . ideological perspectives and beliefs are being considered"—annually doles out the nearly $270,000 UPC Event Fund to support student speech that expresses a political or ideological viewpoint.

189.   For instance, on April 28, 2021—the day after Ratio Christi hosted Dr. Audi—the University Program Council sponsored a virtual talk by Paul Gorski of

24

the Equity Literacy Institute titled, "When Appreciating Diversity is Not Enough." Ex. 13, UPC Event Announcements, at 1–2 .

190.   On information and belief, Gorski expressed political or ideological viewpoints during his presentation.

191.   Also on April 28, the University Program Council sponsored a virtual talk by Bill Nye during which he reportedly addressed "climate change," among other topics. *Id.* at 3–4.

192.   On information and belief, Nye expressed political or ideological viewpoints during his presentation.

193.   Since 2018, the University Program Council also used student fees to sponsor these speakers who, on information and belief, expressed political or ideological viewpoints during their presentations:

   a.   Mike Africa Jr., a member of The MOVE Organization, who gave a presentation titled, "Born on the MOVE," *id.* at 5–7;

   b.   Kate Bornstein, a "trans trailblazer" who gave a presentation titled, "On Men, Women and the Rest of Us," *id.* at 8–9;

   c.   Adam J. Foss, "a fierce advocate for criminal justice reform," who gave a presentation titled, "A Prosecutor's Vision for a Better Justice System," *id.* at 10–11;

   d.   Gabby Rivera, who is described as "a queer Latinx writer," "queer Puerto Rican from the Bronx" and "LGBTQA youth advocate," *id.* at 12–13;

   e.   Mwende Katwiwa, who is described as "a writer, storyteller and social justice advocate" and someone who is "heavily involved in social justice movements, including Black Lives Matter, reproductive justice and LGBTQ+ advocacy," *id.* at 14–15;

25

    f.   Nadine Strossen, a former president of the ACLU who gave a presentation titled, "HATE: Resist it. Don't Censor It," *id.* at 16–17;

    g.   Andi Zeisler, a co-founder and editorial director of the feminist organization "Bitch Media" who gave a presentation titled, "Don't Just Change the Channel: Why Pop Culture Matters to Feminism, Activism and Social Justice," *id.* at 18–19;

    h.   Dr. Bernard Lafayette, a "longtime civil rights activist and organizer" who gave a presentation titled, "Nonviolence in a Time of Civil Unrest: Yesterday and Today," *id.* at 20–21;

    i.   Jim Obergefell, the petitioner in United States Supreme Court case of *Obergefell v. Hodges*, who gave a presentation titled, "Marriage Equality: Love Wins," *id.* at 22–23;

    j.   Amal Kassir, a "spoken word artist" who discussed "activism, social justice and leadership," *id.* at 24–25; and most recently,

    k.   Laverne Cox, a transgender actor who gave a presentation titled, "Ain't I a Woman," *id.* at 26–27.

194.   The LGBTQA+ Center co-sponsored, or partnered with the University Program Council in presenting, the Bornstein, Rivera, Obergefell, and Cox events. *Id.* at 8, 13, 23, 27.

195.   On information and belief, the LGBTQA+ Center has used student fees to sponsor additional student speech that expressed political or ideological viewpoints.

196.   The Women's Center co-sponsored, or partnered with the University Program Council in presenting, the Bornstein, Mwende, and Zeisler events. *Id.* at 8, 15, 19.

197.    On information and belief, the Women's Center has used student fees to sponsor additional student speech that expressed political or ideological viewpoints.

198.    In sum, the University has used and continues to use mandatory student activity fees from Fund A and Fund B to support student speech that expresses viewpoints without presenting opposing viewpoints and without "mak[ing] sure all . . . ideological perspectives and beliefs are being considered."

199.    Yet Defendants denied Plaintiffs monies from the RSO Event Fund unless they compromised their Christian viewpoint by complying with the "no ideology allowed" or "counterviewpoint required" condition.

## C. Plaintiffs' plans for future events

200.    Plaintiffs intend to apply to the University Program Council for monies from the RSO Event Fund to pay for Ratio Christi events during the 2021–2022 school year.

201.    As Ratio Christi has done in prior school years, Plaintiffs intend to bring speakers to campus during the 2021–2022 school year to speak on philosophy topics from a Christian perspective.

202.    For example, Plaintiffs intend to bring Dr. David Baggett to campus in February 2022 to speak about the Christian foundations of morality.

203.    Dr. Baggett is a professor of philosophy and Director of the Center for Moral Apologetics at Houston Baptist University. He has written several books in which he gives an apologetic for Christian morals.

204.    Plaintiffs estimate the event will cost $2,500.

205.    Without monies from the RSO Event Fund, Plaintiffs will be unable to bring Dr. Baggett or other speakers to campus.

206. To adequately plan and prepare for the event, Plaintiffs need to secure a commitment from the University Program Council for funding from the RSO Fund before the end of the Fall semester.

207. But the Campus Speakers Policy, the RSO Event Fund, and Defendants' interpretations of those policies prohibit Plaintiffs from securing RSO Event Fund monies unless Plaintiffs meet the "no ideology allowed" or "counterviewpoint required" condition.

208. What's more, because both Policies give Defendants unbridled discretion, and Defendants have already discriminated against Plaintiffs because of their speaker's Christian viewpoint, Plaintiffs credibly fear that Defendants will deny Ratio Christi any share of the RSO Event Fund or other student fees for their events.

209. Without declaratory and injunctive relief, Plaintiffs will continue to suffer violations of their constitutional rights and irreparable harm.

**COUNT ONE**
**Violation of the First Amendment to the U.S. Constitution**
**Free Speech Clause—Viewpoint Discrimination**
**(42 U.S.C. § 1983)**

210. Plaintiffs repeat each of the allegations in paragraphs 1–209.

211. A public university creates a limited public forum when it uses mandatory student activity fees to support student speech and expression.

212. Within the student activity fee forum, the Free Speech Clause of the First Amendment requires public universities to avoid viewpoint discrimination and unreasonable regulation.

213. Within that same forum, the Free Speech Clause requires public universities to adequately limit the discretion of the officials in charge of disbursing the student fees through narrow, objective, and definite standards to protect against viewpoint discrimination.

28

214.    The Campus Speakers Policy requires a student programming organization, when deciding whether to fund student speech with student fees, to discriminate based on viewpoint *See* Ex. 6, Board Policies, RP-5.6.1.

215.    For instance, the Campus Speakers Policy requires student programming organizations to "provide reasonable political and ideological balance on subjects of politics and government," *id.* ¶ 2; "make reasonable attempts to sponsor a different program within the same academic year which generally represents the opposing part of [the] spectrum of political or ideological ideas" if earlier in the school year "the organization sponsor[ed] a speaker that represents one part of a political or ideological spectrum of ideas," *id.*; "make every attempt to remain neutral and fair in the selection of speakers on subjects of politics, government, and ideologies," *id.* ¶ 3; and "organize internal committees that will have an ongoing responsibility to ensure that a balanced program is presented," *id.* ¶ 4.

216.    The Campus Speakers Policy thus directs student programming organizations to censor viewpoints that the organization determines are overrepresented and to give preference to those viewpoints the organization determines are underrepresented.

217.    The Campus Speakers Policy also fails to set out narrow, objective, and definite standards for the allocation of student fees for student speech.

218.    The Campus Speakers Policy, for instance, includes these undefined terms or phrases that are subject to a range of interpretations: "reasonable political and ideological balance," "spectrum of ideas," "reasonable attempts," "generally represents," "opposing part of [the] spectrum," "make every attempt," "neutral and fair," and "balanced program." *Id.* ¶¶ 2–4.

219.    The Campus Speakers Policy thus grants student programming organizations like the University Program Council unbridled discretion to

discriminate based on viewpoint in deciding whether to use student fees to support student speech.

220.   The RSO Event Fund Policy requires the University Program Council, when deciding whether to fund student speech with monies from the RSO Event Fund, to discriminate based on viewpoint.

221.   For instance, the RSO Event Fund Policy prohibits the use of monies from the Fund to pay for "speakers of a political and ideological nature" (i.e., the "no ideology allowed" condition) or requires that an event with such a speaker include "another spokesperson with a different ideological perspective" (i.e., the "counterviewpoint required" condition).

222.   As further example, when making a funding decision under the RSO Event Fund Policy, the University Program Council examines whether "all . . . ideological perspectives and beliefs are being considered" and whether a student organization's event "serve[s] [the] organization and further[s] its purpose."

223.   The RSO Event Fund Policy also fails to set out narrow, objective, and definite standards for the allocation of student fees for student speech.

224.   For instance, the RSO Event Fund Policy fails to define what constitutes "political and ideological" speech, fails to establish how "different" a second speaker's "ideological perspective" must be to balance out the first speaker's perspective, and fails to set out any criteria to confine the Program Council's determination of whether "all . . . ideological perspectives and beliefs are being considered" at any particular speaking event.

225.   The RSO Event Fund Policy thus grants the University Program Council and its Fund Allocation Committee unbridled discretion to discriminate based on viewpoint when deciding whether to use RSO Event Fund monies to support student speech.

226.    Further, Defendants actively engaged in viewpoint discrimination against Ratio Christi and its members by enforcing viewpoint-based prohibitions to deny funding for Dr. Audi's April 2021 lecture.

227.    Defendants' offer to fund the event with RSO Event Fund monies if Ratio Christi complied with the "counterviewpoint required" condition does not remedy or cure Defendants' viewpoint discrimination.

228.    Instead, Defendants' "counterviewpoint required" condition compounded the constitutional problems by trying to compel Ratio Christi to speak a message that it did not want to speak as a condition for receiving RSO Event Fund monies.

229.    Defendants have also discriminatorily enforced their "no ideology allowed" and "counterviewpoint required" conditions against disfavored viewpoints, such as Ratio Christi's "Christian perspective."

230.    Defendants do not consistently impose either of those conditions on other organizations that are funded with Fund A or Fund B and that use student fees to pay for student speech.

231.    Those organizations include the University Program Council, Women's Center, and LGBTQA+ Center.

232.    Defendants' system of allocating mandatory student activity fees from Fund A and Fund B to support student speech, including the Campus Speakers and the RSO Event Fund Policies, does not support a compelling government interest and is not narrowly tailored to any such interest.

233.    Defendants' system of allocating mandatory student activity fees from Fund A and Fund B to support student speech, including the Campus Speakers and RSO Event Fund Policies, violates the Free Speech Clause of the First Amendment to the United States Constitution, both facially and as applied.

31

234.    Because of Defendants' actions, Plaintiff Ratio Christi and its members have suffered, and continue to suffer, economic injury and irreparable harm, and are entitled to an award of monetary damages and equitable relief.

**COUNT TWO**
**Violation of the First Amendment to the U.S. Constitution**
**Free Speech Clause—Compelled Speech**
**(42 U.S.C. § 1983)**

235.    Plaintiffs repeat each of the allegations in paragraphs 1–209.

236.    The Free Speech Clause of the First Amendment prohibits the government from compelling citizens to speak or support a message not of their own choosing.

237.    Defendants' "counterviewpoint required" condition required Plaintiffs to include a speaker opposing Dr. Audi's viewpoint as a condition of funding Dr. Audi's speaking event under the Campus Speakers Policy and RSO Event Policy.

238.    In the future, Plaintiffs will be unable to secure funding for speakers who express a political or ideological viewpoint unless they satisfy the "counterviewpoint required" condition.

239.    Thus, the Campus Speakers Policy, RSO Event Policy, and Defendants' enforcement of those Policies have compelled and continue to compel Plaintiffs to fund and support speech that they object to.

240.    The prohibition against compelled speech also protects the disbursement of mandatory student fees. Thus, public universities cannot compel students to pay mandatory student fees that are used to support student speech they find objectionable unless those fees are allocated in a viewpoint-neutral manner.

241.    Defendants, through their system of allocating mandatory student activity fees from Fund A and Fund B to support student speech, including the

32

Campus Speakers and RSO Event Fund Policies, do not disburse the student fees in a viewpoint-neutral manner.

242.    Defendants have therefore unconstitutionally compelled, and continue to compel, all University students, including Student Plaintiffs and every student member of Ratio Christi, to fund and support student speech and viewpoints they find offensive and objectionable.

243.    The University's policy that allows students to request a refund of that portion of their student fees that go into Fund A within the first four weeks of the start of the semester does nothing to remedy or cure Defendants' unconstitutional use of student fees from either Fund A or Fund B.

244.    Defendants' system of allocating mandatory student activity fees from Fund A and Fund B to support student speech, including the Campus Speakers and RSO Event Fund Policies, does not support a compelling government interest and is not narrowly tailored to any such interest.

245.    Defendants' system of allocating mandatory student activity fees from Fund A and Fund B to support student speech, including the Campus Speakers and RSO Event Fund Policies, violates the Free Speech Clause of the First Amendment to the United States Constitution, both facially and as applied.

246.    Because of Defendants' actions, Plaintiff Ratio Christi and its members have suffered, and continue to suffer, economic injury and irreparable harm, and are entitled to an award of monetary damages and equitable relief.

**COUNT THREE**
**Violation of the First Amendment to the U.S. Constitution**
**Free Speech Clause—Overbreadth**
**(42 U.S.C. § 1983)**

247.    Plaintiffs repeat each of the allegations in paragraphs 1–209.

33

248.    Under the Free Speech Clause of the First Amendment, a government policy may be invalidated as overbroad if a substantial number of its applications are unconstitutional when judged in relation to the policy's legitimate sweep.

249.    Defendants' system of allocating mandatory student activity fees from Fund A and Fund B to support student speech is overbroad because it restricts a great deal of constitutionally protected speech.

250.    Take for instance the phrases "political or ideological spectrum of ideas" in the Campus Speakers Policy and "political and ideological nature" in the RSO Event Fund Policy.

251.    Defendants do not define what speech constitutes "political" or "ideological," what comprises a "political or ideological spectrum of ideas," or what constitutes "political and ideological" speech.

252.    The phrases "political or ideological spectrum of ideas" and "political and ideological nature" are extremely broad and can encompass any views on politics, political theory, philosophy, sociology, economics, social justice, race, or sexuality, to name just a few.

253.    And Defendants have shown that they will consider "political" or "ideological" anything from a "Christian perspective."

254.    The system of allocating mandatory student activity fees from Fund A and Fund B to support student speech, including the Campus Speakers and RSO Event Fund Policies, therefore unconstitutionally disfavors a great deal of protected speech when compared to its legitimate sweep.

255.    By classifying Plaintiffs' event as "political and ideological," Defendants enforced these overbroad Policies against Plaintiffs.

256.    Defendants' system of allocating mandatory student activity fees from Fund A and Fund B to support student speech, including the Campus Speakers and

34

RSO Event Fund Policies, violates the Free Speech Clause of the First Amendment to the United States Constitution, both facially and as applied.

257.   Because of Defendants' actions, Plaintiff Ratio Christi and its members have suffered, and continue to suffer, economic injury and irreparable harm, and are entitled to an award of monetary damages and equitable relief.

**COUNT FOUR**
**Violation of the First Amendment to the U.S. Constitution—**
**Free Exercise Clause**
**(42 U.S.C. § 1983)**

258.   Plaintiffs repeat each of the allegations in paragraphs 1–209.

259.   Plaintiffs are motivated by their sincerely held religious beliefs to promote speech on campus on several topics from a Christian worldview. Plaintiffs believe their on-campus speech is a way to share the Gospel of Jesus Christ with non-Christians and a way to disciple and equip other Christians on campus to grow and mature in their faith.

260.   The First Amendment's Free Exercise Clause guarantees religious believers—at a bare minimum—equal treatment.

261.   A public university policy that burdens religious exercise and is not both neutral and generally applicable must satisfy strict scrutiny.

262.   And a public university policy that targets religious beliefs is never permissible.

263.   Defendants' system of allocating mandatory student activity fees from Fund A and Fund B to support student speech, including the Campus Speakers and RSO Event Fund Policies, burdens religious exercise.

264.   The system placed, and continues to place, Plaintiffs and other religious student organizations in the position of choosing to either (a) meet the "no ideology allowed" or "counterviewpoint required" condition for speaking events, or (b) forego receipt of any student fees to pay for or defray the costs of those events.

265.    Defendants' system of allocating mandatory student activity fees from Fund A and Fund B to support student speech, including the Campus Speakers and RSO Event Fund Policies, is not both neutral and generally applicable.

266.    Defendants have established a system of individualized exemptions for when they impose the "no ideology allowed" or "counterviewpoint required" condition on the use of student fees to support student speech.

267.    Defendants have used, and continue to use, Fund A and Fund B fees to pay for secular speakers who express a viewpoint without requiring the secular hosting organizations to meet either the "no ideology allowed" or "counterviewpoint required" condition.

268.    Defendants also targeted Plaintiffs because of their religious beliefs. Defendants, through the University Program Council, denied the use of student fees to help fund the Dr. Audi event because of "its Christian ideological nature," because of the event's "Christian perspective," and because of the Council's alleged "job to make sure all . . . ideological perspectives and beliefs are being considered, not just Christianity."

269.    Defendants' system of allocating mandatory student activity fees from Fund A and Fund B to support student speech, including the Campus Speakers and RSO Event Fund Policies, does not support a compelling government interest and is not narrowly tailored to any such interest.

270.    Defendants' system of allocating mandatory student activity fees from Fund A and Fund B to support student speech, including the Campus Speakers and RSO Event Fund Policies, violates the Free Exercise Clause of the First Amendment to the United States Constitution, both facially and as applied.

271.    Because of Defendants' actions, Plaintiff Ratio Christi and its members have suffered, and continue to suffer, economic injury and irreparable harm, and are entitled to an award of monetary damages and equitable relief.

36

**COUNT FIVE**
**Violation of the Fourteenth Amendment to the U.S. Constitution**
**Equal Protection Clause**
**(42 U.S.C. § 1983)**

272.   Plaintiffs repeat each of the allegations in paragraphs 1–209.

273.   The Equal Protection Clause of the Fourteenth Amendment protects against invidious discrimination.

274.   Plaintiffs are similarly situated to other student organizations and their members at the University.

275.   Under Defendants' system of allocating mandatory student activity fees from Fund A and Fund B to support student speech, including the Campus Speakers and RSO Event Fund Policies, Defendants refuse to fund Ratio Christi events unless Plaintiffs meet the "no ideology allowed" or "counterviewpoint required" condition.

276.   Defendants have treated other student organizations and their members more favorably than Plaintiffs through the allocation of monies from the RSO Event Fund and the UPC Event Fund without imposing on those organizations the "no ideology allowed" or "counterviewpoint required" condition.

277.   Ratio Christi is also similarly situated to student organizations at the other three campuses comprising the University of Nebraska system.

278.   On information and belief, System Defendants—i.e., Regent Defendants and Defendant Carter—have allowed student fees at the other universities comprising the University system to go toward similar student events for other student organizations without imposing on the host organizations a "no ideology allowed" or "counterviewpoint required" condition.

279.   Defendants have refused the funds to Ratio Christi here because of Plaintiffs' viewpoint and religious exercise, which the First Amendment protects.

280.   Because Defendant's refusal infringes on Plaintiffs' First Amendment rights, discriminatory intent is presumed.

37

281.   And Defendants have engaged in this discriminatory activity by applying the Campus Speakers Policy and RSO Event Fund Policy to Ratio Christi to intentionally discriminate against Plaintiffs' rights to free speech and free exercise of religion.

282.   Defendants' system of allocating mandatory student activity fees from Fund A and Fund B to support student speech, including the Campus Speakers and RSO Event Fund Policies, does not support a compelling government interest and is not narrowly tailored to any such interest.

283.   What's more, there is no reasonably conceivable state of facts that provide a rational basis for requiring Plaintiffs to meet the "no ideology allowed" or "counterviewpoint required" condition to receive student fees, while not requiring similarly situated organizations to meet either condition to receive student fees.

284.   Defendants' system of allocating mandatory student activity fees from Fund A and Fund B to support student speech, including the Campus Speakers and RSO Event Fund Policies, violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, both facially and as applied.

285.   Because of Defendants' actions, Plaintiff Ratio Christi and its members have suffered, and continue to suffer, economic injury and irreparable harm, and are entitled to an award of monetary damages and equitable relief.

### PRAYER FOR RELIEF

Thus, Plaintiffs request that this Court:

A.   Enter a judgment declaring that Defendants' system of allocating mandatory student activity fees from Fund A and Fund B to support student speech, including the Campus Speakers Policy and RSO Event Fund Policy, violates Plaintiffs' First and Fourteenth Amendment rights, both facially and as applied;

B. Enter a preliminary and permanent injunction prohibiting Defendants sued in their official capacities, including their agents, officials, servants, employees, and any other persons acting on their behalf, from enforcing their system of allocating mandatory student activity fees from Fund A and Fund B to support student speech, including the Campus Speakers and RSO Event Fund Policies, or from using any part of that system to discriminate against Plaintiffs because of their viewpoints, including the viewpoints of their speakers;

C. Enter a preliminary and permanent injunction prohibiting Defendants sued in their official capacities, including their agents, officials, servants, employees, and any other persons acting on their behalf, from charging Plaintiffs student activity fees in any future semesters so long as the system of allocating mandatory student activity fees from Fund A and Fund B to support student speech, including the Campus Speakers and RSO Event Fund Policies, remains in place;

D. Award compensatory damages, including reimbursement of student activity fees paid and the expenses incurred for the Dr. Audi event, for the violation of Plaintiffs' constitutional rights;

E. Award nominal damages for the violation of Plaintiffs' constitutional rights;

F. Award Plaintiffs' reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

G. Award any other relief to which Plaintiffs may be entitled.

Respectfully submitted this 27th day of October, 2021.

s/ Richard J. Wall, Jr.

Richard J. Wall, Jr.
Bar No. 25432
Owner
THE ESTATE PLANNING LAW FIRM OF
RICHARD J. WALL, JR., P.C., L.L.O.
2935 Pine Lake Road, Suite D
Lincoln, NE 68516
Telephone: (402) 421-8686
Facsimile: (402) 421-3225
rj@walljr.com

Greggory R. Walters*
AZ Bar No. 036590
Senior Counsel
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
Facsimile: (480) 444-0028
gwalters@adflegal.org

J. Caleb Dalton*
VA Bar No. 83790
Legal Counsel
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Ste. 600
Washington, DC 20001
Telephone: (202) 393-8690
Facsimile: (202) 393-3622
cdalton@adflegal.org

Michael R. Ross*
TN Bar No. 035304
Legal Counsel
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway, Suite 300
Lansdowne, VA 20176
Telephone: (571) 707-4655
Facsimile: (571) 707-4790
mross@adflegal.org

*Attorneys for Plaintiffs*

*\*Pro hac vice application forthcoming*

40

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury for all issues so triable.

s/

Richard J. Wall, Jr.
*Attorney for Plaintiffs*

41

**DECLARATION UNDER PENALTY OF PERJURY**

I, _Zachary C. Thompson_, a citizen of the United States and a resident of

the State of Nebraska, declare under penalty of perjury under 28 U.S.C. § 1746 that the

above is true and correct to the best of my knowledge.

Executed this _13_ day of _October_, 20_21_, at
_University of Nebraska-Lincoln_.


_Zachary Thompson_
Zachary Thompson, on behalf of Plaintiff
Ratio Christi at the University of
Nebraska-Lincoln

41

**DECLARATION UNDER PENALTY OF PERJURY**

I, _Elena Thomson_, a citizen of the United States and a resident of the State of Nebraska, declare under penalty of perjury under 28 U.S.C. § 1746 that the above is true and correct to the best of my knowledge .

Executed this _13_ day of _October_, 202_1_, at _University of Nebraska- Lincoln_

_Elena J Thomson_

Elena Thomson, in her individual capacity

42

**DECLARATION UNDER PENALTY OF PERJURY**

I, William Lloyd Johnson , a citizen of the United States and a resident of

the State of Nebraska, declare under penalty of perjury under 28 U.S.C. § 1746 that the

above is true and correct to the best of my knowledge.

Executed this 13th day of October , 2021, at
University of Nebraska, Lincoln .

William Johnson, in his individual
capacity

43

**DECLARATION UNDER PENALTY OF PERJURY**

I, _Zachary  C. Thompson_____, a citizen of the United States and a resident of the State of Nebraska, declare under penalty of perjury under 28 U.S.C. § 1746 that the above is true and correct to the best of my knowledge.

Executed this _13_ day of _October_, 20_21_, at _University of  Nebraska-Lincoln_.

_Zachary Thompson_____
Zachary Thompson, in his individual capacity

45

### DECLARATION UNDER PENALTY OF PERJURY

I, _Holly Fischer_, a citizen of the United States and a resident of the State of Nebraska, declare under penalty of perjury under 28 U .S.C. § 1746 that the above is true and correct to the best of my knowledge.

Executed this _18_ day of _October_, 2021, at _11:08 am_.

_Holly Fischer_
Holly Fischer, in her individual capacity

46