IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| RATIO CHRISTI AT THE UNIVERSITY OF NEBRASKA-LINCOLN, et al.,<br><br>          Plaintiffs,<br><br>   vs.<br><br>PAUL KENNEY, Chair of the Board of Regents of the University of Nebraska, in his individual and official capacity, et al.,<br><br>          Defendants. | 4:21-CV-3301<br><br><br>MEMORANDUM AND ORDER |

This matter is before the Court on the defendants' motion to dismiss (filing 17) pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6). The motion will be granted in part and denied in part.

## I. BACKGROUND

Ratio Christi is a "Christian apologetics organization" with "student-led chapters at universities in the United States and internationally." Filing 1 at 6. According to the plaintiffs, the Ratio Christi chapter at the University of Nebraska-Lincoln (UNL)—which has been a recognized student organization (RSO) on campus since 2019—is "an unincorporated expressive and religious association" made up of students who seek "to advance a biblical worldview and explain how the Bible informs various moral, cultural, and political issues." Filing 1 at 6-7. In support of this mission, the UNL Ratio Christi

chapter[1] holds weekly Bible studies, speaks at churches and camps, and hosts lectures and debates open to all students where theologians speak in defense of Christianity or debate academics about the validity of Christianity. Filing 1 at 6.

The individual plaintiffs—Zachary Thompson, Holly Fischer, William Johnson, and Elena Thomson—are all UNL students and officers for Ratio Christi who allegedly pay "more than $600 in mandatory student activity fees" every semester. Filing 1 at 7, 14. A portion of these fees become part of "Fund A" which is used "to pay for programs and activities managed by student groups." Filing 1 at 14; filing 18 at 5. But the bulk of student activity fees collected go to "Fund B," which is used to "service debt on facilities and fund staff salaries and operating costs for various student services." Filing 1 at 14; filing 18 at 10-11. And although students can request a refund each semester for the portion of their student activity fees that would go to Fund A, the plaintiffs claim that this refund option is not explained to students on their tuition invoices. Filing 1 at 15.

Pursuant to restrictions put in place by the Board of Regents of the University of Nebraska (the Board), Fund A money can only be allocated to student government, student programming, and student newspapers to support student speech. Filing 1 at 16-17; filing 1-7 at 10. Fund A dollars are allocated among these activities by the student governing body, the Association of Students of the University of Nebraska (ASUN), which in recent years has given an annual allocation of approximately $280,000 to the University Program Council (UPC), an RSO that strives to "provide diverse, educational,

---

[1] The UNL Ratio Christi Chapter, although referred to as "Ratio Christi" throughout this Order for the sake of brevity, is not to be confused with the overarching Ratio Christi organization, which is not a party to this action.

and entertaining programs to enhance" the University of Nebraska community. Filing 1 at 3; filing 1-10 at 2; *see* filing 18 at 2, 15. And UPC generally earmarks $10,000 of its annual allocation to the "RSO Event Fund," which is used to "fund events held by the hundreds of [RSOs] on campus." Filing 1 at 4, 16; filing 18 at 2. To receive money from the RSO Event Fund, RSOs must apply to UPC's Fund Allocation Committee. Filing 1 at 22. The remainder of UPC's annual Fund A allocation is used "to host its own programs and events for students." Filing 1 at 17; filing 18 at 7. In other words, the funding scheme looks something like this:



Different policies are in place for funding decisions at different points in the scheme. As relevant, the "Campus Speakers Policy" is promulgated by the Board and purportedly applies to any student programming organization that administers a speakers program. Filing 1 at 19. That policy, briefly summarized, requires student programming organizations that have a

3

speakers program to "provide reasonable political and ideological balance on subjects of politics and government." Filing 1 at 19-20. The UPC, however, allegedly has adopted its own policies for the RSO Event Fund. *See* filing 1 at 22. And according to the complaint, the RSO Event Fund Policy provides that funds allocated under the RSO Event Fund may not be used for speakers "of a political and ideological nature." Filing 1 at 20.

It is UPC's distribution of the RSO Event Fund which gave rise to the current action. According to the plaintiffs, Ratio Christi applied to receive $1,500 from the RSO Event Fund "to help pay for an upcoming lecture by Dr. Robert Audi, a Christian philosopher and University of Notre Dame professor." Filing 1 at 4. Dr. Audi was slated to respond to the most popular arguments against God. Filing 1 at 4. But UPC allegedly responded that it could only approve Ratio Christi's funding request if it arranged for "another spokesperson with a different ideological perspective" to speak at the event because the RSO Event Fund could not be used to finance "speakers of a political and ideological nature." Filing 1 at 4; filing 1-12 at 4-5. In a later email, UPC allegedly clarified that it would not fund the Ratio Christi event as proposed because of "its Christian ideological nature" and "Christian perspective," as UPC is tasked with making sure all "ideological perspectives and beliefs are being considered, not just Christianity." Filing 1 at 4; filing 1-12 at 4-5. Ultimately, Ratio Christi and its members funded the event, which cost around $900. Filing 1 at 24.

But although that funding decision set events in motion, the plaintiffs' claims sweep far more broadly, posing a broadside attack on the entire funding scheme. In addition to the injuries allegedly incurred from the denial of their funding request, the plaintiffs also allege that the defendants discriminatorily impose these "counterviewpoint" or "no ideology allowed" conditions when

4

allocating "hundreds of thousands of dollars in student fees each year to pay for speakers and other events promoting political and ideological viewpoints." *See* filing 1 at 5, 24. Specifically, they allege that the defendants "have allocated RSO Event Fund monies to [RSOs] . . . to pay for 'speakers of a political and ideological nature,' and have done so without requiring those organizations to include 'another spokesperson with a different ideological perspective' at the same event." Filing 1 at 24. Additionally, UPC has allegedly hosted several events using Fund A monies where the speakers "expressed political or ideological viewpoints" regarding transgender issues, criminal justice reform, the LGBTQA+ community, and reproductive justice, but none of these events included a speaker with a countering viewpoint. *See* filing 1 at 24-25. Finally, recipients of Fund B student fees, such as the campus LGBTQA+ Center and Women's Center, have allegedly used these non-refundable student fees to sponsor similar events. *See* filing 1 at 17, 18, 26-27.

And the plaintiffs allege that the defendants' adoption and enforcement of unconstitutional policies led to (1) the university's discriminatory system for distributing their student fees, and (2) the specific denial of their funding request. For example, the plaintiffs argue that the Campus Speakers Policy requires UPC and other student programming organizations to unconstitutionally "consider a proposed speaker's viewpoints" when making funding decisions and also fails to set out "narrow, objective, and definite standards" to curb the discretion of decisionmakers. Filing 1 at 19. Additionally, the plaintiffs challenge UPC's RSO Event Fund Policy, arguing that it also fails "the viewpoint-neutrality requirement." Filing 1 at 21.

In sum, Ratio Christi and a number of its members have sued the defendants under 42 U.S.C. § 1983, arguing that the defendants' "system of allocating mandatory student activity fees from Fund A and Fund B to support

student speech, including the Campus Speakers Policy and RSO Event Fund Policy, violates [p]laintiffs' First and Fourteenth Amendment rights, both facially and as applied." Filing 1 at 38. In light of these alleged violations, the plaintiffs are seeking declaratory and injunctive relief prohibiting the defendants sued in their official capacities from (1) enforcing their allegedly unconstitutional system of allocating mandatory student activity fees, including the Campus Speakers and RSO Event Fund Policies, or using any part of that system to discriminate against the plaintiffs, and (2) charging the plaintiffs student activity fees in any future semesters so long as this system and its policies remain in place. Filing 1 at 38-39. The plaintiffs are also seeking "compensatory damages," including "reimbursement of student activity fees paid and the expenses incurred for the Dr. Audi event, for the violation of [p]laintiffs' constitutional rights." Filing 1 at 39. The defendants have moved to dismiss this action on multiple grounds under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Filing 17.

## II. STANDARD OF PROOF

A motion pursuant to Fed. R. Civ. P. 12(b)(1) challenges whether the court has subject matter jurisdiction. The party asserting subject matter jurisdiction bears the burden of proof. *Great Rivers Habitat All. v. FEMA*, 615 F.3d 985, 988 (8th Cir. 2010). Rule 12(b)(1) motions can be decided in three ways: at the pleading stage, like a Rule 12(b)(6) motion; on undisputed facts, like a summary judgment motion; and on disputed facts. *Jessie v. Potter*, 516 F.3d 709, 712 (8th Cir. 2008). Overall, the court has "substantial" authority to determine whether it has jurisdiction. *Osborn v. United States*, 918 F.2d 724, 730 (8th Cir. 1990). The defendants here present a facial challenge.

And to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a

claim to relief that is plausible on its face. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* While the Court must accept as true all facts pleaded by the non-moving party and grant all reasonable inferences from the pleadings in favor of the non-moving party, *Gallagher v. City of Clayton,* 699 F.3d 1013, 1016 (8th Cir. 2012), a pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. *Iqbal,* 556 U.S. at 678. Determining whether a complaint states a plausible claim for relief will require the reviewing court to draw on its judicial experience and common sense. *Id.* at 679.

## III. DISCUSSION[2]

### 1. BOARD OF REGENTS

First, the defendants have moved to dismiss any claims against the Board *as an entity*, arguing the Board "is a state agency with sovereign

---

[2] According to the plaintiffs, the defendants' motion does not specifically pursue dismissal of any of the five counts in the complaint. *See* filing 23 at 9. But in arguing that their system for allocating student fees—including the Campus Speakers Policy—is viewpoint neutral and constitutional under the Supreme Court's test in *Board of Regents of the University of Wisconsin System v. Southworth,* 529 U.S. 217 (2000), the defendants necessarily argue that its systems do not violate the First Amendment's viewpoint discrimination, compelled speech, overbreadth, and free exercise principles. *See generally* filing 18; filing 27. And in this way, the defendants also contest the plaintiffs' claims for declaratory and injunctive relief from this fee allocation system. *See* filing 23 at 2. However, the Court has structured this Order to address the defendants' proffered bases for dismissal in the order they were presented to the Court, *see* filing 18 at 3-4, and will address the particular arguments concerning the defendants' alleged constitutional violations as they arise within this format.

7

immunity under the Eleventh Amendment." Filing 18 at 13; *see* filing 17 at 2. According to the plaintiffs, this request is "moot" because their claims are against the members of the Board in their official and individual capacities, not the Board as an entity. Filing 23 at 9. Still, the defendants contend that the language in the complaint is ambiguous and could be interpreted as naming the Board as a party. Therefore, the Court should make it clear that any such claims are dismissed. Filing 27 at 4 n.2.

The Court agrees with the plaintiffs—there are no claims against the Board to dismiss. The plaintiffs' complaint clearly states that it is suing each "member" of the Board "individually and in their official capacities." Filing 1 at 1; filing 23 at 2 n.2. And since the Court cannot dismiss claims that were not made, it will move on from this issue without addressing the defendants' immunity argument.

### 2. ASUN & UPC

Next, the defendants assert that all claims against ASUN and UPC should be dismissed under Rule 12(b)(1) because the entities "are arms of the State of Nebraska entitled to sovereign immunity and not subject to § 1983 claims." Filing 18 at 13; *see* filing 27 at 3; filing 17 at 2. In response, the plaintiffs first raise a procedural argument, concluding that (1) sovereign immunity is not an issue of subject matter jurisdiction, and therefore, Rule 12(b)(1) and its standard for facial attacks do not apply, and (2) because the "arm of the State" argument is instead an affirmative defense, dismissal is only appropriate under Rule 12(b)(6) if the defendants "show that the face of the Complaint admits all facts necessary to conclude [ASUN and UPC] are arm[s] of the State." *See* filing 23 at 10, 17-18, 34.

To start, Rule 12(b)(1) *does* provide the proper framework for analyzing whether ASUN and UPC are arms of the state entitled to immunity, as the

Eighth Circuit has held that Eleventh Amendment immunity is a threshold *jurisdictional* matter. *See Minnesota RFL Republican Farmer Lab. Caucus v. Freeman*, 33 F.4th 985, 989 n.4 (8th Cir. 2022); *Murphy v. Arkansas*, 127 F.3d 750, 755 (8th Cir. 1997). However, if an attack under Rule 12(b)(1) is "facial" rather than "factual"—meaning the Court is restricted to the face of the pleadings when considering the motion—the non-moving party receives the benefit of Rule 12(b)(6) safeguards. *See Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). And here, the defendants' "challenge to this Court's subject matter jurisdiction is facial, rather than factual." Filing 18 at 11; *see* filing 27 at 3. Therefore, although the plaintiffs' underlying analysis was inexact, their ultimate conclusion was correct: at this stage, the claims will only be dismissed if the facts pleaded in the complaint—when taken as true and viewed in the light most favorable to the plaintiffs—establish that ASUN and UPC are arms of the State entitled to Eleventh Amendment immunity.

Turning to the merits, the sovereign immunity enjoyed by states and recognized in the Eleventh Amendment bars private parties from bringing actions for damages against unconsenting states in federal courts. *Thomas v. St. Louis Bd. of Police Comm'rs*, 447 F.3d 1082, 1084 (8th Cir. 2006) (citing *Becker v. Univ. of Neb.*, 191 F.3d 904, 908 (8th Cir. 1999)). This immunity also extends to "arms of the state." *Id.* Whether a particular state agency is an arm of the state is a question of federal law, but in reaching this conclusion courts must consider the provisions of state law that define the agency's character. *Id.* (citing *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 n.5 (1997)).

Specifically, courts should assess the agency's degree of autonomy and control over its own affairs, its powers and characteristics under state law, and most importantly, whether a money judgment against the agency will be derived from the state treasury. *Id.* (citations omitted); *Treleven v. Univ. of*

9

*Minn.*, 73 F.3d 816, 818 (8th Cir. 1996). These factors help the Court determine if the suit "is in reality a suit against the state." *Hadley v. N. Ark. Cmty. Tech. Coll.*, 76 F.3d 1437, 1440 (8th Cir. 1996) (quoting *Sherman v. Curators of Univ. of Mo.*, 16 F.3d 860, 863 (8th Cir. 1994)). Using this analysis, the Eighth Circuit has held that "the University of Nebraska and its institutions are considered an arm of the State of Nebraska for purposes of the Eleventh Amendment." *Becker*, 191 F.3d at 908.

The defendants argue that since ASUN and UPC are institutions of the university, as outlined in *Becker*, they are arms of the state entitled to Eleventh Amendment immunity. Filing 18 at 13-20. Additionally, they argue that even if the Court were to reject this conclusion and conduct an independent arm-of-the-state analysis with the factors listed above, both entities would still be entitled to immunity. Filing 18 at 13-20. Conversely, the plaintiffs argue the ruling in *Becker* is not dispositive, as it "only begs the question of what is a University 'institution' for purposes of the Eleventh Amendment," filing 23 at 40, and when viewing the complaint in the light most favorable to the plaintiffs, there are not sufficient facts for the Court to conclude that ASUN and UPC are university institutions or arms of the state. Filing 23 at 34-40.

The Court agrees with the plaintiffs. First, at this stage, *Becker* is not dispositive in determining whether ASUN and UPC are entitled to Eleventh Amendment immunity. In *Becker*, the Eighth Circuit affirmed the district court's order granting the University of Nebraska at Omaha's motion to dismiss, agreeing that the Omaha campus was an "institution" of the university, and therefore, an "arm of the State" entitled to immunity. *Becker*, 191 F.3d at 908-09. In reaching this conclusion, the *Becker* court did not elaborate on the definition of a university "institution" for purposes of the Eleventh Amendment; however, the court did cite to authority instructing

courts to examine the nature of an entity, including its powers and characteristics, when determining if it is an instrumentality of the state entitled to immunity. *Id.* at 908 (citing *Regents of the Univ. of Cal.*, 519 U.S. at 429-31; *Hadley*, 76 F.3d at 1439).

Relying on *Becker* and Nebraska Supreme Court precedent, courts in this district have held "that the Board is a state agency with sovereign immunity under the Eleventh Amendment." *Krause v. Bd. of Regents of Univ. of Neb.*, No. 8:16-CV-204, 2016 WL 11658910, at *2 (D. Neb. July 15, 2016) (citing *Doe v. Bd. of Regents of the Univ. of Neb.*, 788 N.W.2d 264, 281 (Neb. 2010), *overruled on other grounds by Davis v. State*, 902 N.W.2d 165, 186 (2017)). Additionally, courts in this district have held that UNL and its "divisions," including the Agricultural Research and Development Center, are arms of the state. *See Osterloh v. ARDC*, No. 8:95-CV-1, 1996 WL 885548, at *2 (D. Neb. Apr. 22, 1996). However, the Court is unaware of any cases in this circuit finding ASUN and UPC, or similar organizations, to be institutions of the university for Eleventh Amendment purposes. And since these entities are vastly different in nature than the Board or an entire university campus, the Court must conduct a fact-intensive inquiry, similar to that in *Osterloh*, to determine if a suit against them has "essentially the same practical consequences as a judgment against the State itself," thereby rendering them arms of the state. *Becker*, 191 F.3d at 909.

As stated above, *at this stage*, the Court is limited to the facts alleged in the complaint when making this determination. First, the Court looks to facts outlining the nature of ASUN, including its autonomy and control over its own affairs. According to the complaint, ASUN is "the supreme student governing body at the university" established by § 2.13 of the Board's Bylaws. Filing 1 at

11

12; *see* filing 1-2 at 15. As a democratic body, students elect ASUN's student leaders. *See* filing 1-2 at 15.

Though ASUN possesses the authority to allocate Fund A monies, it must do so in accordance with the Board's policies, and any allocations are subject to the final approval of the Vice Chancellor. Filing 1 at 11-12; *see* filing 1-7 at 10; filing 1-9 at 2. Additionally, while the Board has vested ASUN with the authority to develop reasonable rules and regulations for student self-government, filing 1-2 at 9, its Constitution and Bylaws only "become a part of the Rules of the Board" if approved by the university Chancellor. Filing 1-2 at 15. ASUN's regulatory power is also allegedly cabined by the Board's ability to take *any* action required in the exercise of its legal duties, which necessarily includes action that contradicts or supersedes ASUN rules and regulations. *See* filing 1 at 12; filing 1-2 at 9. Finally, according to the Board's Bylaws, ASUN's president for UNL must serve as a *de jure* nonvoting member of the Board as dictated by Article VII, Section 10 of the Nebraska Constitution. Filing 1-2 at 8-9.

While some of these facts *may suggest* that ASUN has limited "operational independence," insomuch as the state greatly regulates the way it carries out its limited purpose, *see Public Sch. Ret. Sys. of Mo. v. State St. Bank & Trust Co.*, 640 F.3d 821, 827 (8th Cir. 2011), and in this way functions more like an instrumentality of the state, the Court agrees with the plaintiffs that further discovery is needed to determine "how, in practice, the Board or University exercises that oversight." Filing 23 at 36-37. Evidence of how often ASUN's Fund A allocation recommendations are amended or overturned by university officials, and whether or how its external revenue sources and spending are regulated by the university will provide critical insight into the degree of control ASUN has over its own affairs, which is especially important

12

to the analysis given ASUN's "political independence" from the state in electing its own members. *See id.* at 828-29. In sum, the facts in the complaint, while providing some insight into the characteristics of ASUN's structure, are simply too undeveloped for the Court to adequately determine ASUN's level of autonomy and control over its operations. And while the Nebraska Constitution provides evidence that ASUN is entwined with the Board in some capacity, this limited recognition in state law is not enough, at this stage, to determine the overall nature of ASUN's operations.

There are also not sufficient facts *in the complaint* for the Court to determine the most important factor in the arm-of-the-state analysis: whether the funds to pay a damages award against ASUN will be derived from the state treasury. *See Greenwood v. Ross*, 778 F.2d 448, 453 (8th Cir. 1985). From the face of the complaint, the Court can only infer that part of ASUN's funding is comprised of student fees from Fund A. Filing 1 at 16. And while Nebraska law does provide that these fees are to be held as part of the University Cash Fund in the custody of the State Treasurer, Neb. Rev. Stat. § 85–125, and are "public funds subject to many restrictions as to how they may be expended," *Larson v. Bd. of Regents of Univ. of Neb.*, 204 N.W.2d 568, 571 (Neb. 1973), the Court does not know enough about the overall funding structure of ASUN, at this stage, to make a final determination as to where ASUN would derive funds to satisfy a damages award.[3]

---

[3] The Court agrees that ASUN's and UPC's revenue disclosures in their Form 990s— including the amount of their funding that comes from student fees—may be highly relevant in determining whether the organizations are arms of the state. Filing 27 at 21; *see Hadley, 76 F.3d at 1440-1441*. However, since that information was not included in the plaintiffs' pleadings, it is not relevant when assessing the defendants' *facial* attack to this Court's jurisdiction.

And there are even fewer facts in the complaint that would allow the Court to conclude, at this stage, that UPC is an arm of the state entitled to Eleventh Amendment immunity. According to the complaint, UPC is funded, at least in part, by Fund A monies and is tasked with disbursing student fees allocated to the RSO Event Fund in accordance with the Campus Speakers Policy. Filing 1 at 3-4; *see* filing 1-7 at 8. While UPC adopts its own constitution and elects its own student representatives, *see* filing 1-10, it is allegedly overseen by the Vice Chancellor for Student Affairs. Filing 1 at 11. Based on this limited information, UPC appears to have a similar level of operational and political independence as ASUN. But again, the Court is unable to accurately determine the level of autonomy and control UPC has in its daily operations based on these limited factual allegations. Likewise, the barebones allegation that UPC receives some funding from student fees, which are held in the custody of the state treasurer, is insufficient at this stage to conclude the organization is entitled to Eleventh Amendment immunity.

State law provides even less insight into the nature of UPC and its relation to the university. Unlike ASUN, whose members are considered part of the Board pursuant to the Nebraska Constitution and whose approved regulations are deemed part of the Board's official rules, UPC is allegedly one of the hundreds of RSOs on campus that are unmentioned in state law. *See* filing 1 at 3. And it would be a far stretch of this circuit's precedent to deem every university RSO an arm of the state. Therefore, while UPC's power to allocate some student fees *may suggest* that it is subject to more substantial oversight and control by the state than other RSOs, this cannot be adequately

determined from the facts in the complaint. Accordingly, the Court will not dismiss the claims against ASUN and UPC at this stage.[4]

### 3. INDIVIDUAL DEFENDANTS IN OFFICIAL CAPACITY

The defendants have also moved to dismiss any claims for *damages* against the individual defendants in their official capacities, arguing the Court lacks subject matter jurisdiction to hear these claims. Filing 17 at 2; filing 18 at 19. Specifically, the defendants take issue with the fact that the plaintiffs' "requests for damages are not limited to individual-capacity claims." Filing 18 at 20. In response, the plaintiffs assert the issue is moot because they "are not seeking damages against Individual Defendants in their official capacities." Filing 23 at 9 n.2. And again, the defendants urge the Court to grant its motion on these grounds, insisting the plaintiffs' complaint is "ambiguous" and fails to "limit their prayers for damages to individual-capacity Defendants." Filing 27 at 4 n.2.

The law is clear that both § 1983 and the Eleventh Amendment prohibit damage claims against individual defendants acting in their official capacities.

---

[4] This does not mean, however, that these organizations cannot be state actors for § 1983 purposes. An entity can be a state actor but not meet the requirements to be an arm of the state. In fact, "a private party" can still "be deemed a state actor," and therefore, be liable under § 1983 when it "acts under cover of state law and performs a function 'traditionally exclusively reserved to the state.'" *Reasonover v. St. Louis Cnty.*, 447 F.3d 569, 584 (8th Cir. 2006) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352, (1974)). And the Court agrees with the plaintiffs that the defendants—in arguing that ASUN and UPC are arms of the state responsible for distributing student fees—have seemingly conceded that these entities, at the very least, are state actors for § 1983 purposes. Thus, where the defendants have presented no arguments otherwise, the plaintiffs' § 1983 claims against these entities will proceed at this stage.

*Murphy v. Ark.*, 127 F.3d 750, 754 (8th Cir. 1997). And despite the plaintiffs' reassurances, the Court agrees the complaint fails to adequately specify that the plaintiffs' claims for damages are limited to the individual defendants in their individual capacities. For the sake of clarity, the Court concludes that *any claims for damages* against the individual defendants in their official capacities are dismissed. But since the doctrine set forth in *Ex Parte Young*, 209 U.S. 123 (1908), permits state officials to be sued in federal court in their official capacities for *prospective* injunctive relief when the plaintiff alleges the officials are acting in violation of the Constitution or federal law, any such claims *that are sufficiently stated* by the plaintiffs will not be dismissed.

### 4. PLAINTIFFS' CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS[5]

As outlined above, the plaintiffs have generally brought two types of claims under § 1983: facial and as applied. First, the plaintiffs assert that the individual defendants violated their First and Fourteenth Amendment rights "by enforcing [the] viewpoint-based prohibitions," including the Campus Speakers Policy and the RSO Event Fund Policy, that were used to deny Ratio Christi's funding request. Filing 1 at 31. In other words, the policies allegedly adopted and enforced by the individual defendants were unconstitutional *as applied* to the plaintiffs' funding request, and therefore, the individual defendants are liable for damages. *See* filing 1 at 39; filing 23 at 18-20.

Additionally, the plaintiffs claim that the "defendants' [overall] system of allocating mandatory student activity fees . . . to support student speech, including the Campus Speakers and the RSO Event Fund Policies," facially violates the First and Fourteenth Amendments, thereby entitling the plaintiffs

---

[5] The "individual defendants" include each member of the Board, President Carter, Chancellor Green, and Vice Chancellor Bellows. *See* filing 17 at 2.

to declaratory and injunctive relief prohibiting the defendants from enforcing this system and its underlying policies. *See* filing 1 at 29-39. For the reasons set forth below, the individual defendants have moved to dismiss these claims.

(a) Plaintiffs' As-Applied Challenge to the Campus Speakers Policy[6]

To prevail on an as-applied challenge, the plaintiffs must show that the Campus Speakers Policy was in fact unconstitutionally applied to them—preventing them from speaking while permitting someone with another viewpoint to do so. *Phelps-Roper v. Ricketts*, 867 F.3d 883, 896 (8th Cir. 2017). In this way, an as-applied challenge can be established if Ratio Christi shows that the denial of its funding request is "fairly traceable" to the individual defendants' alleged application of the Campus Speakers Policy. *See Young Am.'s Found. v. Kaler*, 14 F.4th 879, 888-89 (8th Cir. 2021).

Similarly, for the individual defendants to be liable under § 1983 for injuries arising from the unconstitutional application of a policy, the plaintiffs must plead facts showing that the individual defendants were personally involved in this violation. *See Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). And in this case, whether the plaintiffs have plausibly alleged that the Campus Speakers Policy was unconstitutionally applied to deny Ratio Christi funding is closely related to the issue of whether the plaintiffs have plausibly alleged that the individual defendants were personally involved in UPC's allegedly unconstitutional decision.

---

[6] The defendants do not contest the plaintiffs' allegation that UPC's RSO Event Fund Policy was unconstitutional as applied to the plaintiffs. As such, these claims will proceed as part of this action.

17

*(i) Personal Involvement*

To state a claim under § 1983, the plaintiff must plead that a government official has personally violated the plaintiff's constitutional rights. *Jackson*, 747 F.3d at 543. Because of this, the doctrine of respondent superior is inapplicable to actions brought pursuant to this section, meaning a defendant's general responsibility for supervising operations is insufficient, on its own, to establish personal involvement in a violation. *Glick v. Sargent*, 696 F.2d 413, 415 (8th Cir. 1983). However, even if a supervisor is not involved in day-to-day operations, his personal involvement may be found if he is involved in creating, applying, or interpreting a policy that gives rise to unconstitutional conditions. *Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir. 2009).

The defendants argue that "the adoption and application of the RSO Event Fund Policy by [UPC] to deny Ratio Christi funding were actions that in no way personally involved any of the individual defendants." Filing 18 at 22. So, they say, because this funding decision was made by UPC according to the RSO Event Fund Policy, and the Campus Speakers Policy was never applied to the plaintiffs, the plaintiffs' claims for damages against the individual defendants for the expenses of Dr. Audi's lectures should be dismissed for lack of personal involvement. *See* filing 27 at 10-13.

The plaintiffs, however, present multiple theories to support their claim that the individual defendants, and their Campus Speakers Policy, were involved in UPC's decision to deny Ratio Christi funding: (1) since the individual defendants oversee the entire student fee system at the university, they knew or should have known that the Campus Speakers Policy and RSO Event Fund Policy used by UPC to make funding decisions were unconstitutional, and yet they failed to repeal such policies, (2) UPC's decision to deny funding was based on the Campus Speakers Policy, which was adopted

18

and enforced by the individual defendants, as the RSO Event Fund Policy "stems" from this policy, and (3) the individual defendants adopted the Campus Speakers Policy, which unconstitutionally gave UPC the unbridled discretion to deny Ratio Christi's funding request because of its Christian viewpoint. Filing 23 at 9, 20. For the reasons outlined below, the Court rejects all of the plaintiffs' theories except the third.

The Court agrees with the defendants that there are no facts from which it could be plausibly inferred that the individual defendants were personally involved in the administration of the RSO Event Fund or that they adopted or enforced the RSO Event Fund Policy. First, the complaint asserts that UPC has the authority to decide how to distribute monies from the RSO Event Fund. *See* filing 1 at 22, 30. Additionally, although UPC is required to follow the general guidelines of the Campus Speakers Policy, the complaint also alleges that UPC has adopted its own policies governing the disbursement of the RSO Event Fund and makes the final decisions about funding requests. *See* filing 1 at 22-24, 30. The Campus Speakers Policy reflects such a delegation, providing guidelines for the student programming organizations that are responsible for "administering the speakers programs on each campus." Filing 1-7 at 8.

The complaint is also devoid of facts alleging that the individual defendants were aware of or enforced UPC's particular decision to deny Ratio Christi's funding request. In describing the denial of their request, the plaintiffs allege that they applied to UPC for funds, were told by UPC that a counterviewpoint speaker must be present at the event, and ultimately received an email from UPC denying their request because of the event's "Christian ideological nature." Filing 1 at 22-23. And while the plaintiffs did allege that university officials approve the overall distribution of Fund A and Fund B monies, they failed to allege that any of these officials were personally

involved in, or had the final say over, UPC's decisions regarding the RSO Event Fund.

Still, the plaintiffs assert that, because of their roles at the university, the individual defendants knew or should have known about the allegedly discriminatory RSO Event Fund Policy and UPC's decision to apply a viewpoint-discriminatory funding policy against the plaintiffs. Filing 1 at 8. And they argue that their allegations that the individual defendants are charged with this knowledge, but failed to take any corrective action, are sufficient to allege their personal involvement in UPC's funding decision. *See* filing 23 at 20. But such conclusory allegations are not entitled to be assumed true. *Ashcroft*, 556 U.S. 662. Further, even if the Court were to take them as true, such allegations rely on nothing more than the individual defendants' general responsibility for supervising university operations, which is insufficient to allege personal involvement under § 1983.

The Court is equally unpersuaded by the plaintiffs' argument that they have sufficiently alleged the individual defendants' personal involvement because the RSO Event Fund Policy used to deny Ratio Christi's funding request "stemmed from" the Campus Speakers Policy. Filing 23 at 13. This "interpretation" theory, as the plaintiffs present it, can be summarized as follows. The plaintiffs allege that, "[d]espite the [written] RSO Event Fund Policy's explicit proscription against using RSO Event Fund monies to pay for 'speakers of a political and ideological nature,' [UPC] interprets the Policy to permit funding of such speakers so long as 'another spokesperson with a different ideological perspective' speaks at the same event." Filing 1 at 20. And this interpretation allegedly "stems from the Regent Defendants' Campus Speakers Policy," which provides that:

20

> Student programming organization[s] that administer[] a speakers program[] must . . . provide reasonable political and ideological balance on subjects of politics and government . . . [and] make reasonable attempts to sponsor a different program within the same academic year which generally represents the opposing part of [the] spectrum of political or ideological ideas if earlier in the school year the organization sponsor[ed] a speaker that represents one part of a political or ideological spectrum of ideas.

Filing 1 at 19-20 (referred to as the "balancing provision").

UPC's interpretation of its written policy was then allegedly used to deny Ratio Christi's funding request when it was not interested in having another speaker at the Dr. Audi event to represent the countering viewpoint. Filing 23 at 21. In this way, the plaintiffs allege that Campus Speakers Policy was used by UPC to deny the plaintiffs' funding request in a viewpoint-discriminatory manner.

However, it is not a reasonable inference for the Court to conclude, without any *facts* indicating otherwise, that the Board knew or should have known that UPC would interpret this balancing provision as requiring individual RSOs "to arrange for another speaker with a counterviewpoint to speak at the same event" in order to receive funding. Filing 1 at 20. In fact, the plaintiffs concede that the Campus Speakers Policy, while urging "reasonable political and ideological balance," states only that *the student organizations administering the speakers program* (not the individual RSOs) must "make reasonable attempts" to fund a speaker with a countering viewpoint "*within the same academic year*." Filing 1 at 19 (emphasis added). In this sense, it is not plausible to call UPC's policy an "interpretation" of the Campus Speakers Policy where it allegedly alters the language of this policy drastically to compel

RSOs to sponsor speech with which they fundamentally disagree in order to receive funding. Nor is it plausible to infer that this "interpretation" was required by the language of the Campus Speakers Policy.

Therefore, while the plaintiffs may claim that UPC's adoption and application of its RSO Event Fund Policy violated their First and Fourteenth Amendment rights,[7] the plaintiffs have not alleged *facts* from which the Court can plausibly infer that the individual defendants were personally involved in the adoption or enforcement of the RSO Event Fund Policy or UPC's decision to deny Ratio Christi funding, or that UPC applied a reasonable interpretation of the Campus Speakers Policy in making this decision.

Still, the Court agrees that the individual defendants may be personally liable in the funding denial claim if the plaintiffs have sufficiently alleged that the Campus Speakers Policy, which was allegedly adopted and enforced against UPC by the individual defendants, created the unconstitutional conditions that allowed UPC to make viewpoint-discriminatory funding decisions. Specifically, if the plaintiffs plausibly alleged that the Campus Speakers Policy granted UPC unbridled discretion to distribute student activity fees and deny Ratio Christi's funding request because of its Christian viewpoint, they could claim that the individual defendants, through the adoption and enforcement of this policy, personally violated their constitutional rights. In this way, it could also be plausibly inferred that the plaintiffs' alleged injuries from UPC denying Ratio Christi's funding request are fairly traceable to the Campus Speakers Policy. However, to determine if

---

[7] The defendants do not assert that the plaintiffs have failed to state a claim against ASUN or UPC for the alleged First and Fourteenth amendment violations resulting from Ratio Christi's funding denial. Therefore, the plaintiffs' § 1983 claims against these parties will proceed.

22

the plaintiffs have plausibly alleged an as-applied challenge to the Campus Speakers Policy implicating the individual defendants, the Court must first determine whether the unbridled-discretion doctrine is, in fact, part of the test used to determine if a public university's student fee allocation system complies with the First Amendment. This is disputed by the parties. *See* filing 23 at 19-20; filing 27 at 11.

### a. Applicable Test

Of course, universities can require students to pay fees to support the extracurricular speech of other students, and this is true even if the fees are used to fund speech that a student finds objectionable or offensive. *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 230-31 (2000). However, "objecting students may insist upon certain safeguards with respect to the expressive activities which they are required to support." *Id*. Ultimately, the *Southworth* court held that even though student activity funds are *not* public forums in the traditional sense, the standard for viewpoint neutrality used in its public forum cases is generally a sufficient safeguard to protect the rights of objecting students. *Id*. at 230. Later, in *Martinez*, the Supreme Court clarified that any access barrier to a limited public forum "must be reasonable and viewpoint neutral." *Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez,* 561 U.S. 661, 679 (2010).

Based on these cases, the Eighth Circuit has routinely held that a university's student activity fund is an example of a limited public forum, *Gerlich v. Leath*, 861 F.3d 697, 705 (8th Cir. 2017), and any restrictions to accessing this forum must be reasonable and viewpoint neutral, *Intervarsity Christian Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855, 863 (8th Cir. 2021). Yet, the plaintiffs argue that another element (or safeguard) is necessarily included in this test—unbridled discretion. *See* filing 23 at 24-25. Specifically,

they argue that the requirement of viewpoint neutrality includes a mandate that a decisionmaker not possess unbridled discretion to distribute student fees, and that the Campus Speakers Policy violates this requirement. Filing 23 at 24 (citing *Southworth v. Bd. of Regents of the Univ. of Wis. Sys.*, 307 F.3d 566 (7th Cir. 2002) (identified as *Southworth II*)).

While the Supreme Court has applied the unbridled-discretion doctrine in its traditional public forum cases involving government licensing and permitting systems, it has never explicitly addressed whether the doctrine applies to limited public forums. *See, e.g.*, *Thomas v. Chicago Park Dist.*, 534 U.S. 316 (2002); *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123 (1992); *Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969). However, other circuits that have considered the issue have decided it does. *See, e.g.*, *Freedom from Religion Found., Inc. v. Abbott*, 955 F.3d 417, 427 (5th Cir. 2020); *Kaahumanu v. Hawaii*, 682 F.3d 789, 806 (9th Cir. 2012); *Southworth II*, 307 F.3d 566.

As for the Eighth Circuit, it has applied the Supreme Court's unbridled-discretion doctrine in cases where citizens needed permission to display certain messages on license plates, reasoning that "requiring permission to have a parade is similar to requiring permission to display a message on a license plate." *Lewis v. Wilson*, 253 F.3d 1077, 1080 (8th Cir. 2001); *see Roach v. Stouffer*, 560 F.3d 860 (8th Cir. 2009). Ultimately, in both cases, the court concluded that "[w]here a regulation requires . . . a speaker receive permission to engage in speech, the official charged with granting permission must be provided specific standards on which to base his or her decisions," *Lewis*, 253 F.3d at 1080, since the danger of viewpoint discrimination is "at its zenith" without standards governing the exercise of discretion, *Roach*, 560 F.3d at 869. Consequently, in both cases the Court of Appeals held it was unnecessary to

24

determine precisely what kind of forum a personalized license plate was because, regardless of what kind of forum a license plate might be, both statutes unconstitutionally gave government officials entrusted with enforcing the statutes unbridled discretion to decide who may speak and who may not, and had nothing to prevent those officials from denying a vehicle owner a license plate because of his or her viewpoint. *Lewis*, 253 F.3d at 1079-81; *Roach*, 560 F.3d at 868 n.4.

Later, however, in *Victory Through Jesus Sports Ministry Foundation v. Lee's Summit R-7 School District*, the Eighth Circuit stated that in both limited public forums and nonpublic forums, public entities may impose restrictions on speech that are reasonable and viewpoint neutral. 640 F.3d 329, 334-35 (8th Cir. 2011) (citing *Martinez*, 561 U.S. 661). But when confronted with the plaintiff's facial challenge to a public school district's "Backpack Flyers for Students" policy—based on the alleged unbridled discretion it vested in school administrators to decide which speakers could send flyers—the *Victory* court suggested, in dicta, that the unbridled-discretion doctrine may not be applicable when considering facial challenges to public school policies. *Id*. at 337. Specifically, the court noted that applying the doctrine in such scenarios may not be supported by precedent, based both on the fact that the Supreme Court, in *Arkansas Educational Television Communications v. Forbes,* 523 U.S. 666 (1998), allowed "*ad hoc* but reasonable" decisions by government officials administering a nonpublic forum, and because "[n]either the Supreme Court nor [the Eighth Circuit] has ever applied a stringent, facial standard of judicial oversight to the discretionary decisions of school officials administering a nonpublic educational forum." 640 F.3d at 337. Still, the court concluded that the superintendent "exercised far less than unbridled discretion." *Id*. at 337.

In expressing its hesitancy to allow a facial challenge to the school's policy based on the theory of unbridled discretion, the *Victory* court also noted that it declined to follow *Child Evangelism Fellowship v. Anderson Sch. Dist.,* 470 F.3d 1062 (4th Cir. 2006). *Victory,* 540 F.3d at 337 n.5. In *Child Evangelism Fellowship*, a religious group challenged a public school's policy allowing school officials to determine, based solely on the "district's best interests," which organizations would be granted a fee waiver to use school facilities. 470 F.3d at 1064. The Fourth Circuit ultimately held that the district's fee-waiver system was a limited public forum, that the unbridled-discretion doctrine applied to such forums, and since the school's policy did not provide sufficient criteria to prevent viewpoint discrimination, it "ran afoul of the First Amendment." *Id*. at 1064, 1068-70. Notably, the Eighth Circuit declined to follow the Fourth Circuit's holding that the prohibition on unbridled discretion is applicable in *each* forum type, even though it relied on the Eighth Circuit's decision in *Lewis* to reach this conclusion. *See* 470 F.3d at 1068-69.

However, the *Victory* court did not address the Supreme Court's holding in *Southworth,* which was decided after *Forbes*, and explicitly outlined what was necessary for *a public university's student fee allocation system*, as limited public forum, to comport with the First Amendment. Although this omission is wholly consistent with the fact that the *Victory* court was not considering a university's student activity fee system, this Court agrees that *Southworth* "provides considerable support for applying the unbridled-discretion doctrine *in the precise educational context at issue*." *Viewpoint Neutrality Now! v. Regents of the Univ. of Minn.*, 516 F. Supp. 3d 904, 921 n.22 (D. Minn., Feb. 2, 2021) (emphasis added).

26

In *Southworth*, the Court held that "even though the student activities fund is not a public forum in the traditional sense . . . and despite the circumstance that those cases most often involve a demand for access, not a claim to be exempt from supporting speech," its public forum cases were "instructive" and provided the standard of viewpoint neutrality that was "controlling." 529 U.S. at 230. On remand, the Seventh Circuit, in *Southworth II*, had to decide whether, as in permitting and licensing cases, the plaintiffs could challenge the university's student fee system on the theory that it granted student government unbridled discretion to decide which RSOs to fund. *Southworth II*, 307 F.3d at 574. And the *Southworth II* court ultimately held that the plaintiffs *could* bring such a claim since unbridled discretion is a necessary component of the viewpoint-neutrality standard adopted by the Supreme Court in its public forum cases, and therefore, also part of the viewpoint-neutrality standard the *Southworth* court deemed "controlling" in cases involving a public university's student activity fund. *Id.* at 575-80.

In addition to the language of *Southworth* supporting this outcome, the Supreme Court's rationale for adopting the unbridled-discretion doctrine in its public forum cases likewise supports the conclusion that this standard is necessary to ensure university student activity fees are distributed in a viewpoint-neutral manner that protects students' First Amendment rights. *See id.* at 578-79. Specifically, the Supreme Court has held that "without standards to fetter the licensor's discretion," he or she may permit favorable expression while suppressing unfavorable suppression. *City of Lakewood*, 486 U.S. at 758. And without guideposts to easily determine whether the licensor's denials are legitimate, proving as applied cases could be extremely difficult, especially where licensing officials use shifting and illegitimate criteria in conjunction

with *post hoc* rationalizations. *Id*. Hence the application of the unbridled-discretion doctrine.

And the same concerns exist when a university uses mandatory student activity fees to fund expressive speech. If universities can vest student organizations with unbridled discretion to distribute these fees without have to develop specific standards to determine that these organizations are not engaging in viewpoint discrimination, the danger of viewpoint discrimination would be at its zenith. Universities could simply pass the buck to student organizations without implementing proper safeguards to protect students' First Amendment rights, and in this way, avoid liability for discriminatory student fee allocation systems. Therefore, although courts should be reluctant to substitute their "own notions of sound educational policy for those of the school authorities," courts are still tasked with determining whether public universities have exceeded constitutional constraints. *Turning Point USA at Ark. State Univ. v. Rhodes*, 973 F.3d 868, 877 (8th Cir. 2020). Consequently, the court concludes that, in light of *Southworth* and *Southworth II*, the unbridled-discretion doctrine applies to public university systems for allocating mandatory student activity fees to fund expressive speech, as it is necessary to ensure these fees are used in a viewpoint-neutral manner.

Having determined that unbridled discretion is part of the viewpoint-neutrality standard applicable to mandatory student activity allocation systems at public universities, the Court must determine if the plaintiffs have plausibly alleged that the individual defendants were personally involved in UPC's decision to deny the plaintiffs funding by adopting and enforcing a policy that gave UPC unbridled discretion to deny their funding request because of their event's Christian viewpoint.

28

b. Plaintiffs Plausibly Alleged that the Campus Speakers Policy Vested UPC
with Unbridled Discretion

The plaintiffs argue the Campus Speakers Policy gives student programming organizations, like UPC, unbridled discretion to engage in viewpoint discrimination by failing to set out narrow, objective, and definite standards for the disbursement of student fees to fund extracurricular speech. The defendants contend, however, that the Eighth Circuit's holding in *Roach* found a statute unconstitutional because it provided "no prohibition for viewpoint discrimination." Filing 27 at 15. Accordingly, the defendants argue that since the Campus Speakers Policy explicitly requires viewpoint neutrality, it does not confer an unconstitutional breadth of discretion. Filing 27 at 14-15.

Although this Court determined that the unbridled-discretion doctrine applies to student fee allocation systems at public universities, this discussion did not define what constitutes unbridled discretion. While it is true that the Eighth Circuit found the statutes in both *Lewis* and *Roach* to be unconstitutional because they provided no standards or guidelines whatsoever to limit the unbridled discretion of government decisionmakers, neither Court held that a blanket provision commanding decisionmakers to "make every attempt to remain neutral and fair" is enough on its own to cabin decisionmakers' discretion. Filing 1-7 at 8. In fact, both of these cases relied on the Supreme Court's holding in *Forsyth*, which held that decisionmakers must have definite standards on which to base their decisions. *Forsyth*, 505 U.S. at 130-33; *see Roach*, 560 F.3d at 869; *Lewis*, 253 F.3d at 1080. And in *Forsyth*, it was determined that a county ordinance granted unbridled discretion where the official's decisions were unreviewable, and he was not required to rely on

any objective facts or provide an explanation for his decisions. *Forsyth*, 505 U.S. at 133.

The Campus Speakers Policy provided with the pleadings is completely silent as to whether UPC must provide an explanation for its decision or whether its decisions are reviewable. Filing 1-7. And the facts alleged by the plaintiffs allow the Court, at this stage, to plausibly infer that UPC had discretion to adopt its own policies governing the disbursement of the RSO Event Fund—including policies that conflicted with the Campus Speakers Policy—and make final decisions about funding requests. *See* filing 1 at 22-24. Therefore, although the Campus Speakers Policy directs student programming organizations to be fair, neutral, and not advance any particular political or personal philosophy—in this way urging them to make viewpoint-neutral decisions—the Court cannot plausibly infer that it includes any mechanisms, including review and appeal standards, to ensure that these guidelines are followed.

At this stage, the Court finds this is enough for the plaintiffs to plausibly allege that the individual defendants were personally involved in UPC's allegedly unconstitutional decision to deny Ratio Christi funding through their adoption and enforcement of the Campus Speakers Policy, which allegedly vested UPC with unbridled discretion to engage in viewpoint discrimination. Stated another way, the plaintiffs have plausibly alleged that by adopting and enforcing the Campus Speakers Policy against UPC, the individual defendants denied the plaintiffs access to a viewpoint-neutral speech forum, and as a result, they were denied funding because of their Christian viewpoint.

*(ii) Qualified Immunity*[8]

Though the plaintiffs have alleged sufficient facts to support their claims that the Campus Speakers Policy was fairly traceable to the allegedly unconstitutional denial of their funding request, and therefore, the individual defendants were personally involved in this claim, the individual defendants are entitled to qualified immunity. Qualified immunity shields public officials performing discretionary functions from liability for conduct that does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Parker v. Chard*, 777 F.3d 977, 979 (8th Cir. 2015); *see Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly, and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Pearson*, 555 U.S. at 231. It gives government officials breathing room to make reasonable but mistaken judgments about open legal questions and protects all but the plainly incompetent or those who knowingly violate the law. *Parker*, 777 F.3d at 979-80. In other words, officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines. *Luckert v. Dodge County*, 684 F.3d 808, 817 (8th Cir. 2012).

In determining whether a government official is entitled to qualified immunity, the Court asks (1) whether the facts alleged establish a violation of a constitutional or statutory right and (2) whether that right was clearly

---

[8] Although it is unclear if the individual defendants have specifically raised qualified immunity for this claim, the Court may raise the issue *sua sponte* where the defense is established on the face of the complaint. *See Story v. Foote*, 782 F.3d 968, 969-70 (8th Cir. 2015).

established at the time of the alleged violation, such that a reasonable official would have known that his actions were unlawful. *Johnson v. Phillips*, 664 F.3d 232, 236 (8th Cir. 2011); *see Parker*, 777 F.3d at 980. And while the Court may address these prongs in any order, it may not deny qualified immunity without answering both questions in the plaintiff's favor. *Watson v. Boyd*, 2 F.4th 1106, 1112 (8th Cir. 2021). Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken. *Messerschmidt*, 565 U.S. at 546; *Pearson*, 555 U.S. at 244. The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact. *Pearson*, 555 U.S. at 231.

For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Parker*, 777 F.3d at 980. Clearly established law is not defined at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced. *Id.*; s*ee Seymour v. City of Des Moines*, 519 F.3d 790, 798 (8th Cir. 2008). Instead, the clearly established law must be particularized to the facts of the case. *Gerlich v. Leath*, 861 F.3d 697, 708 (8th Cir. 2017) (citing *White v. Pauly*, 580 U.S. 73 (2017)). It is unnecessary to have a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. *Parker*, 777 F.3d at 980.

Given that questions of qualified immunity are not defined at a high level of generality, the Court is not in agreement with the plaintiffs' portrayal of the issue. Despite the plaintiffs' contentions, the question is not whether

students have a clearly established right to be free from student fee systems that are distributed in an unreasonable or viewpoint discriminatory manner, filing 23 at 32, though this right is clearly established. Instead, the specific question in this case is whether it was clearly established that university students' First Amendment right to have their mandatory student fees administered in a viewpoint-neutral and reasonable manner necessarily includes the right to be free from the unbridled discretion of the decisionmakers administering these funds.

As outlined in the above discussion, it was clearly established that the unbridled-discretion doctrine applies to public forums—specifically licensing and permitting systems where speakers are not requesting funds to support otherwise permissible speech but instead need permission to speak in general—and that speakers' First Amendment rights are violated when decisionmakers in these forums are vested with unbridled discretion. However, those are not the particularized facts in this case. And the Court's analysis demonstrates that it was not clearly established in this circuit at the time the Campus Speakers Policy was adopted and enforced whether that same right exists for students in the educational context.

In fact, neither the Supreme Court nor Eighth Circuit has held that university students' First Amendment right to have their mandatory student fees disbursed in a viewpoint-neutral manner necessarily includes the right to challenge university policies on the theory of unbridled discretion. And the Eighth Circuit's holding in *Victory*—which was decided after *Southworth II*—seemed to articulate skepticism as to whether the unbridled-discretion doctrine applied to limited public forums created by educational institutions. 640 F.3d 329. Accordingly, no reasonable official would have known that the Campus Speakers Policy, which requires student programming organizations

to make fair and neutral decisions, could still be found to violate students' clearly established First Amendment rights because it failed to establish a formal review process or articulate other objective factors to cabin decisionmakers' discretion. Therefore, the individual defendants are entitled to qualified immunity for the plaintiffs' claims that the Campus Speakers Policy, as applied, violated their constitutional rights. Accordingly, the individual defendants cannot be liable for the plaintiffs' damages arising from such claims, including "compensatory damages . . . reimburs[ing] . . . student activity fees paid and the expenses incurred for the Dr. Audi event," and the defendants' motion to dismiss these claims will be granted. Filing 1 at 39.

The Court will note that the plaintiffs also seek a judgment declaring, in part, that the Campus Speakers Policy is unconstitutional as applied to the plaintiffs. Filing 1 at 38. Though qualified immunity shields state actors sued in their individual capacities from claims for *damages*, it does not protect them from claims for equitable relief. *Mead v. Palmer*, 794 F.3d 932, 937 (8th Cir. 2015). But the "Eleventh Amendment does not permit judgments against state officers declaring that they violated federal law in the past." *Just. Network Inc. v. Craighead Cnty.*, 931 F.3d 753, 764 (8th Cir. 2019) (citations omitted). Thus, while the individual defendants may be immune from any declaratory judgment that their personal involvement in the funding decision violated federal law, the plaintiffs may still seek their requested *prospective* declaratory and injunctive relief against the individual defendants in their official capacities on the grounds that the Campus Speakers Policy, as applied to the plaintiffs, violated their First Amendment rights.[9]

---

[9] Likewise, the plaintiffs can seek prospective injunctive and declaratory relief on the grounds that the RSO Event Fund Policy is unconstitutional as applied to them.

34

(b) Plaintiffs' Facial Challenge to the Campus Speakers Policy

The plaintiffs also argue that the Campus Speakers Policy is facially unconstitutional. And "a plaintiff who has established constitutional injury under a provision of a statute as applied to his set of facts may also bring a facial challenge, under the First Amendment overbreadth doctrine, to vindicate the rights of others not before the court *under that provision*." *Sabri v. Whittier Alliance*, 833 F.3d 995 (8th Cir. 2016) (emphasis added). Therefore, the plaintiffs have also sufficiently pled that the Campus Speakers Policy is facially unconstitutional because of the unbridled discretion it allegedly gives to student programming organizations to distribute mandatory student fees,[10] and the Court will not dismiss the plaintiffs' claims seeking prospective equitable relief on these grounds.[11]

However, the plaintiffs also argue that they have sufficiently alleged that the "balancing provision" of the Campus Speakers Policy is facially unconstitutional. Conversely, the defendants argue that this provision is not viewpoint discriminatory on its face. *See* filing 27 at 5-7. And although the Court has already determined that the plaintiffs have sufficiently alleged a facial challenge to the Campus Speakers Policy to the extent it allegedly violates the unbridled-discretion doctrine, the Court will also determine whether the plaintiffs have plausibly alleged that the "balancing provision" is facially unconstitutional. It is an important distinction—if for nothing more

---

[10] And since the defendants do not argue that the plaintiffs failed to plausibly allege that the RSO Event Fund Policy is facially unconstitutional, these claims will also proceed.

[11] Since the plaintiffs' facial challenges seek equitable relief from the Campus Speakers Policy, the Court need not address whether the individual defendants are entitled to qualified immunity on this claim.

than the university's own understanding of how to proceed, both practically and in this litigation—whether the plaintiffs have plausibly alleged that the balancing provision of the Campus Speakers Policy directs viewpoint discrimination in a facially unconstitutional manner, or that the policy is facially unconstitutional because it fails to sufficiently bridle decisionmakers' discretion, or both.

The Court finds that the plaintiffs have failed to plausibly allege that the balancing provision is viewpoint discriminatory on its face. In applying the viewpoint-neutrality standard to university student activity fee allocation systems, the *Southworth* court noted that it "gave substance" to the viewpoint neutrality obligation in *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995). *See* 529 U.S. at 233. And the *Rosenberger* court, in describing this principle, explained that "government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." 515 U.S. at 829. More specifically, the court reasoned that viewpoint discrimination occurs when a state "exclude[s]," "discriminate[s] against," or "select[s] for disfavored treatment" certain speech because of the speaker's viewpoint, as ideologically driven attempts to suppress a particular point of view are presumptively unconstitutional. *Id.* at 829-31.

In this way, the university in *Rosenberger* engaged in viewpoint discrimination when it "select[ed] for disfavored treatment those student journalistic efforts with religious editorial viewpoints." *Id.* at 831. Later, in *Martinez*, the Supreme Court described its line of cases involving violations of the First Amendment by universities as cases where the university restricted, singled out, or excluded the speech of particular student groups because of their viewpoints. *See Martinez,* 561 U.S. at 683; *see also Bus. Leaders In Christ*

36

*v. Univ. of Iowa,* 991 F.3d 969, 983 (8th Cir. 2021). The Eighth Circuit has similarly held that universities have violated the viewpoint neutrality standard by excluding student groups from certain benefits because of their viewpoint. *See Bus. Leaders In Christ,* 991 F.3d at 983-84.

The plaintiffs allege that the "balancing provision" of the Campus Speakers Policy violates the viewpoint neutrality standard by directing "student programming organizations to censor viewpoints that the organization determines are overrepresented and to give preference to those viewpoints the organization determines are underrepresented." Filing 1 at 29. In this way, they argue that certain viewpoints must be disfavored or restricted to make room for less popular counterviewpoints. But this is not a *reasonable* inference based on the text of the Campus Speakers Policy, and since there are no facts alleging that such directives were issued by university leaders, the Court is not required to take this allegation as true.

While the text of the policy does direct student programming organizations to "make reasonable attempts to sponsor a different program within the same academic year which generally represents the opposing part of the spectrum of political and ideological ideas," filing 1-7 at 8, nowhere does it state that another RSO supporting the *same* viewpoint as a previously sponsored RSO cannot receive funding until a counterviewpoint event has been sponsored. Nor does it state that specific monies must be set aside (or are unavailable to speakers with certain viewpoints) to ensure counterviewpoint events receive funding. In this way, it cannot reasonably be inferred that the language of the policy directs the suppression or restriction of majority viewpoints, or gives funding preference to certain RSOs.

The plaintiffs further argue that a policy that requires the examination of a speaker's viewpoint in any manner is "obviously unconstitutional." *See*

37

filing 23 at 29. And since the student organizations must consider speakers' viewpoints to determine if they qualify as a "counterviewpoint event," the policy mandates viewpoint discrimination. But as outlined above, that is not the understanding of viewpoint discrimination that this circuit or the Supreme Court has advanced. By the very nature of its title, viewpoint *discrimination* involves suppressing, excluding, or singling out certain speech for disfavored treatment. And instead of directing the suppression of certain speech, the language of the Campus Speakers Policy does the exact opposite— urges student organizations to ensure *no* viewpoint is excluded or disfavored by directing them to make reasonable efforts to fund speakers representing all viewpoints on an issue in the same academic year.

And the Court is not persuaded by the plaintiffs' argument that the Seventh Circuit's holding in *DeBoer v. Vill. of Oak Park*, 267 F.3d 558, 571 (7th Cir. 2001) supports the proposition that policies like the Campus Speakers Policy—which direct *student organizations in charge of funding decisions* to make *reasonable attempts* to fund speakers with counterviewpoints within the same academic year—violate students' clearly established First Amendment right to viewpoint neutrality. *See* filing 23 at 29. In *DeBoer*, civic programs that wished to use the Village Hall for an event were required to "accommodate various viewpoints on the civic topic" at their event. *DeBoer*, 267 F.3d at 571. The court held that this policy violated viewpoint neutrality principles because if a group wished to espouse only its particular viewpoint, it could not access the Village Hall, and in this way, its viewpoint was suppressed by the government mandate that either no viewpoint or all viewpoints be expressed at a particular event. *Id*. at 51-72.

While the village's policy was similar to UPC's "counterviewpoint required" policy to access the RSO Event Fund, the Court has concluded this

policy cannot be reasonably attributed to the Campus Speakers Policy. And the language of the Campus Speakers Policy in no way mandates RSOs to accommodate counterviewpoint speakers at their individual events in order to receive funding, thereby diminishing *DeBoer*'s precedential value for the case at hand. Accordingly, the Court finds that the plaintiffs have failed to plausibly allege that the "balancing provision" of the Campus Speakers Policy, on its face, violates the viewpoint-neutrality principles of the First Amendment.[12] In this way, the plaintiffs' facial challenge is limited to their allegation that the Campus Speakers Policy vests student programming organizations with unbridled discretion.

(c) Plaintiffs' Overall Challenge to University System of Allocating Mandatory Student Activity Fees

Lastly, the plaintiffs claim that the university's overall structure for distributing student activity fees violates the First and Fourteenth Amendments. Specifically, the plaintiffs claim that the university discriminatorily and inconsistently imposes funding conditions on organizations that use student fees to pay for student speech. *See* filing 1 at

---

[12] This analysis also supports the conclusion that students' clearly established First Amendment right to be free from viewpoint discrimination in the distribution of student fees means the right to not have certain speech restricted, singled out, or excluded because of its viewpoint. Therefore, reasonable officials would not have known that a policy, like the Campus Speakers Policy, which tried to ensure minority views were treated with the same respect as majority views, *see Southworth*, 529 U.S. at 235, violated this right. This is relevant because, even if the plaintiffs had managed to allege that the balancing provision is viewpoint discriminatory and that UPC applied this policy, in part, to deny their funding request, the individual defendants would still be entitled to qualified immunity on such claims.

31, 37-38. However, the defendants only contest the plaintiffs' claims that the university policies were discriminatorily and inconsistently applied to UPC—in the disbursement of its separate UPC Event Fund—as well as the LGBTQA+ Center and Women's Center located in the student union.

But the defendants' specific arguments against this claim are brief and not easy to decipher. Their argument for dismissal appears to be that these organizations, as agencies and institutions of the university, are engaged in government speech, and therefore, are allowed to convey messages without viewpoint neutrality as part of the university's educational mission. *See* filing 18 at 10-11 25; filing 27 at 16. And since the "[p]laintiffs cite not one case in which that kind of speaker funding has been held to constitute a limited public forum as distinct from government speech," the individual defendants argue they are entitled to qualified immunity for any claims that these "agencies'" used student fees in a viewpoint-discriminatory manner. Filing 27 at 15-16. They also claim that any claim that university policies were inconsistently applied does not support a Fourteenth Amendment claim against the LGBTQA+ and Women's Centers because the plaintiffs have failed to allege that these organizations are RSOs. *See* filing 18 at 25 n.3.

However, the defendants' arguments seem to miss the point. It is true that "when the government speaks for itself, the First Amendment does not demand airtime for all views." *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1587 (2022). Although the "line between a forum for private expression and the government's own speech is important, [it is] not always clear." *Id*. Instead, the Court must undertake a "holistic inquiry" to determine whether the government intends to speak for itself or to regulate private expression. *Id*. Therefore, the defendants' conclusory assertion that these organizations are government speakers is not enough to justify dismissal at this stage.

Additionally, the defendants' claim that there are no cases clearly establishing "that kind" of speaker funding as a limited public forum does little but further confuse the issue. The Court takes this statement as arguing that there are no cases clearly establishing that the speech of university student centers constitutes a limited public forum, as opposed to government speech. Even if that is true, it does not address the plaintiffs' claim. The defendants do not contest the plaintiffs' allegations that these organizations use Fund B monies (which consist of mandatory student activity fees) to fund expressive speech. *See* filing 18 at 9-11, 25 n.3. And at a basic level, the plaintiffs contend that although these organizations were receiving mandatory student fees and using them to fund expressive speech, they were not subject to the same conditions and policies governing other organizations' use of such fees to fund political and ideological speech. In this way, the plaintiffs allege that the university discriminatorily enforced its policies to favor organizations expressing certain viewpoints.

*Southworth* clearly established that when "students are being required to pay fees which are subsidies for speech they find objectionable, even offensive," they have a right to demand those funds be administered in a viewpoint-neutral manner. *Southworth*, 529 U.S. at 230. However, *Southworth* did not say, as the defendants seem to assert, that when the government or its institutions are using student activity fees to fund expressive speech, the requirement of viewpoint neutrality does not apply. In this way, even if these organizations were government speakers, it is not clearly established that the government can give them mandatory student activity fees and subject them to allegedly less stringent disbursement requirements than other student programming organizations because of their university-aligned viewpoints.

41

The Court will concede that the plaintiffs' claim—that the university's overall mandatory student fee allocation system violates the First and Fourteenth Amendments by discriminatorily and inconsistently applying certain policies—is not well developed and somewhat difficult to follow. And whether they will ultimately be able to prove such a claim is yet to be determined. But even if there may be appropriate grounds for dismissal, it is not proper for the Court to dismiss the claim where the defendants have failed to present those reasons to the Court.

And quite possibly, the confusion surrounding this claim may even further the plaintiffs' argument to the extent it demonstrates that the university's student fee allocation system seems to be riddled with differing policies whose applications are unclear. For example, it is unclear from the record why—despite the Campus Speakers Policy clearly allowing organizations to fund political and ideological speakers—the written RSO Event Fund Policy creates a directly contrary rule of "no political or ideological speech allowed" for RSOs seeking to fund campus speakers. Meanwhile, UPC is allegedly allowed to use student fee proceeds in its separate UPC Event Fund to host political and ideological speakers. *See* filing 1 at 24-26. And although it appears that certain student centers at the union disburse funds to speakers presenting on political and ideological topics, filing 1 at 24-26, it is unclear from the defendants' arguments which policies they are subject to when distributing student fees.

While there very well may be a clear system for disbursing student fees and lawful explanations for the differing standards and policies presented in the record, that cannot be determined at this stage from the facts and arguments before the Court. As such, the Court will not, on this limited record, dismiss the plaintiffs' claims requesting compensatory damages and equitable

relief on the grounds that the university's system of allocating mandatory student activity fees from Fund A and Fund B to support student speech violates the plaintiffs' First and Fourteenth Amendment rights, both facially and as applied. *See* filing 1 at 38-39.[13]

IT IS ORDERED:

1.  The defendants' motion to dismiss (filing 17) is granted in part, and in part denied.

2.  The defendants' motion to dismiss the plaintiffs' claims asserted against the Board of Regents "as a body" is denied, as the request is moot.

3.  The defendants' motion to dismiss the plaintiffs' claims against ASUN and UPC is denied. At this stage, the Court cannot find that these entities are immune from suit under the Eleventh Amendment.

4.  The defendants' motion to dismiss the plaintiffs' claims for *damages* against the individual defendants in their official capacities is granted.

---

[13] Since the individual plaintiffs have alleged that they pay university fees and that the system for allocating these fees is violating their constitutional rights, they have established an "as applied" challenge.

5.   The defendants' motion to dismiss claims for damages against the individual defendants in their individual capacities is granted in part and denied in part.

   a.  The plaintiffs' claims for damages against the individual defendants in their individual capacities to reimburse the expenses incurred for the Dr. Audi event are dismissed. To the extent the plaintiffs' complaint established the individual defendants' personal involvement in UPC's allegedly unconstitutional decision to deny Ratio Christi funding for this event, the individual defendants are entitled to qualified immunity.

   b.  As the plaintiffs have sufficiently alleged that the university's overall system for allocating Fund A and Fund B monies was unconstitutional as applied, they may seek compensatory damages against the individual defendants in their individual capacities, including the reimbursement of student activity fees paid into said system.

Dated this 13th day of July, 2022.


                                    BY THE COURT:

                                    _____
                                    John M. Gerrard
                                    United States District Judge

44